| THIBODEAUX, Judge.
A mother appeals the involuntary termination of her parental rights to her four minor children. The trial court terminated Tina Walters’ parental rights after finding that she is incapable of parenting and that her reformation is unlikely. We find the record does not support the termination of her parental rights and reverse and remand to the trial court.
I.

ISSUES

The issues presented for appellate review are:
(1) whether Ms. Walters was unfairly denied legal representation;
(2) whether the trial court erred in terminating Ms. Walters’ parental rights; and,
(3) whether Ms. Walters should be allowed continued contact with her children should her parental rights be terminated.
II.

FACTS

Tina Marie Walters is the mother of four minor children: S.M.W. born August 7, 1985; C.D.W. born August 26, 1986; C.N.W. born July 1, 1988; and, E.S.W. born October 21, 1990. Kevin Melder is the father of S.M.W., C.D.W. and C.N.W. Timothy Johnson is the father of E.S.W. Ms. Walters has never been married and bore all four of her children before her twenty-first birthday.
The Walters children were brought to the attention of the State through the Department of Social Services (hereinafter “the Department”) and its Office of ^Community Services (hereinafter “OCS”) in December 1995[1] based on allegations of child abuse and neglect after it was reported that E.S.W. had marks on his back suggestive of physical abuse. At the time this report was made, Ms. Walters was incarcerated pending charges for theft, burglary and possession of marijuana, and her family was caring for her children. The relatives relinquished custody of the children because they could not manage the additional responsibility. It was recommended that the children be adjudicated children in need of care and placed in the custody of the Department. The juvenile court found that there were reasonable grounds to believe the children were in need of care, abused or neglected, and issued an Oral Instanter Order, temporari *164 ly placing the children in the custody of the Department on December 21, 1995. The order was to be in effect for six months, from December 19, 1995 — June 18, 1996. Ms. Walters was released on bond on December 23, 1995, two days after the order was issued. The trial judge determined that it was in the best interests of the children that they remain in the State’s custody pending the resolution of their mother’s legal problems.
The children were adjudicated children in need of care pursuant to La.Ch.Code art. 666 on January 24, 1996. On May 7, 1996, Ms. Walters pled guilty to twenty-four counts of criminal charges. She was given a five year suspended sentence with probation. A week later, OCS recommended continued foster care which the court granted on May 29, 1996. During the following years, OCS formulated a series of case plans which were initially meant to reunify the Walters family. The goal was changed to termination of Ms. Walters’ parental rights and freeing the children for adoption in December 1996. Consequently, the Department | «filed a Petition for Certification for Adoption and Termination of Parental Rights. The trial court granted the petition, terminating the parental rights of Ms. Walters as well as those of Mr. Melder and Mr. Johnson. Ms. Walters appeals.
III.
LAW AND DISCUSSION Burden of Proof
The interest of a parent in her children and the parent’s freedom to make choices about the upbringing of her children are among esteemed societal rights shielded by the Fourteenth Amendment against unwarranted usurpation, disregard or disrespect by the State. M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parent’s constitutionally protected liberty interest includes her right to the companionship, custody and management of her children. State in the Interest of A.C., 93-1125 (La.1/27/94); 643 So.2d 719, cert. denied, A.St.P.C. v. B.C., 515 U.S. 1128, 114 S.Ct. 2291, 132 L.Ed.2d 292 (1995). Louisiana jurisprudence has long recognized that the biological parents’ rights to their children and the children’s reciprocal rights are preeminent among relationships in the human family. See In re Adoption of B.G.S., 556 So.2d 545 (La.1990); In the Interest of C.L.S., 94-531 (La.App. 3 Cir. 11/2/94); 649 So.2d 532.
A parent has a commanding interest in the accuracy and injustice of a decision to terminate her parental rights. Lassiter v. Department of Social Svcs. of Durham County, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In order to terminate these rights, the State must satisfy an onerous burden of proof. In the Interest of L. v. AS., 94-1316 (La.App. 3 Cir. 2/1/95); 649 So.2d 1183. The State must prove each element of a ground for termination under La.Ch.Code art. 1015 by clear and convincing Levidence. La.Ch. Code art. 1035(A); State in the Interest of Q.P., 94-609 (La.App. 3 Cir. 11/2/94); 649 So.2d 512. Once the State makes this showing, the judge may terminate parental rights if the termination is in the best interest of the child. La.Ch.Code art. 1037. “Accordingly, so long as a parent adequately cares for his or her children, (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children.” Troxel v. Granville, 530 U.S. 57, -, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), pp. 63-64.
“Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge.” Santosky v. Kramer, 455 U.S. 745, 762, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982). The trial court possesses great discretion to undervalue probative facts that favor *165 the parent when evaluating the nature and quality of a parent’s encounters with the Department. Id. Recognizing the magnitude of the risks and consequences of an erroneous deprivation, appellate courts view the termination of parental rights as a severe and permanent action warranting careful scrutiny. State in the Interest of Z.D. and J.D., 95-1680 (La.App. 4 Cir. 2/15/96); 669 So.2d 1312. Whether a parent has so failed in providing for her children as to satisfy the requirements for severing her parental rights is a question of fact. State in the Interest of K.N.F., 96-390 (La.App. 3 Cir. 7/17/96); 677 So.2d 166. An appellate court will not reverse the trial court’s finding of fact regarding the termination of parental rights unless it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We conclude that the factual findings are manifestly erroneous. We, therefore, conduct a de novo review of the record.
| sAppointment of Counsel
Ms. Walters argues that she was unfairly disadvantaged throughout the progression of the Department’s case because counsel was not appointed to represent her until the termination proceeding.
In Lassiter, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, the United State Supreme Court acknowledged that, in a proceeding to terminate parental rights, both the State and the parent have an interest in the availability of appointed counsel for the parent. The Court observed, “If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State’s interest in the child’s welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal.” 452 U.S. at 28, 101 S.Ct. at 2160. The importance of appointed counsel for parents in termination proceedings derives, in part, from the fact that the parents in termination proceedings, who are commonly people with little education and who have uncommon difficulty dealing with life, are likely to be overwhelmed when thrust into such an inherently distressing and disorienting situation as a termination proceeding. Id.
Counsel is also important to redress the great disparity in the resources available to the parent and those available to the Department. The United States Supreme Court discussed this disparity in Santosky, 455 U.S. at 763,102 S.Ct. at 1400:
The State’s ability to assemble its case almost inevitably dwarfs the parents’ ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State’s attorney usually will be expert on the issues ^contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency’s own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.
(Emphasis added.)
The record shows that Ms. Walters was represented by counsel at various stages of the reunification and termination process. On several occasions, she was represented by Mr. K Ray Rush, who later became her appointed counsel. There is no indication that she ever requested and was denied appointment of counsel. Therefore, while parents in termination proceedings would greatly benefit from the assistance of counsel from the moment their children are removed from *166 their custody, we cannot find that Ms. Walters suffered legal detriment by the delay in the appointment of counsel to represent her.
GROUNDS FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS
The Department petitioned for the termination of Ms. Walters’ parental rights pursuant to La.Ch.Code art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his needs for a stable and permanent home.
|7Thus, for termination under Article 1015(5), the Department must prove three elements: (1) the children have been in the State’s custody for at least one year; (2) Ms. Walters did not substantially comply with court-approved case plans; and, (3) Ms. Walters’ reformation in the near future is unlikely.
DURATION OF STATE CUSTODY
The children were first placed in the temporary custody of the Department in December 1995. But for a brief trial placement of two of the children with Ms. Walters in 1997, the children had been in the custody of the Department for nearly three years when the Department filed the Petition for Certification for Adoption and Termination of Parental Rights. Thus, the first element of this ground for termination has been proven.
SUBSTANTIAL COMPLIANCE WITH CASE PLAN
The second element for termination under Article 1015(5) is lack of substantial compliance with a court-approved case plan. Proof of this element is the subject of La.Ch.Code art. 1036(C):
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
|s(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
The Department developed a series of case plans to facilitate the permanent reunification of Ms. Walters and her children. These plans were reviewed regularly and modified to meet the family’s needs. Each of the plans imposed essentially the same requirements on Ms. Walters: to be supportive of her children’s foster placements; to maintain family relationships through contact and visitation; to provide adequate supervision for the children; to enroll in and complete parenting classes; to secure and maintain stable employment; to pro *167 vide adequate housing for the children; to inform the Department of changes in her living arrangements and in the children’s lives; to submit to and participate in periodic psychiatric evaluations and counseling; and to comply with the conditions of her probation. We will evaluate Ms. Walters’ compliance with the requirements of her case plans under Article 1036(C).
Visitation and Foster Care
Ms. Walters was required to maintain family relationships and be supportive of the children’s foster placements. The Department reports that she |nregularly attended the meetings with OCS and the foster parents to develop a permanent reunification plan for her family.
Ms. Walters diligently attended the restrictive scheduled visitations with her children. Initially, she was permitted only two hours supervised visitation each month at the Civic Center Boardwalk in Lake Charles, Louisiana. Her visitation was increased to unsupervised, overnight visits in her home. Only when the Department changed its goal from reunification to adoption was her visitation again restricted. The evidence shows that Ms. Walters fully complied with this component of her case plans.
The record contains many reports by OCS that the children profited from their placements in foster care. When assessing the children’s progress in foster care, OCS observed improvements in their grades, their dispositions and cited the changes as support for permanently placing the children with adoptive families. OCS remarked that C.D.W. continued to have disciplinary problems during his placement in foster care. Although the children’s improvements are laudable, they are not among the enumerated grounds for terminating parental rights.
The Department stresses the number of months the children were in the State’s custody. Termination proceedings based, in part, on the length of time a child spends in foster care, could be affirmatively harmful to the child and the parent because such focus ignores both the status of the relationship between the child and the parent and the results of efforts to improve the conditions that caused the initial placement in foster care. Naomi R. Cahn, Children’s Interests in a Familial Context: Poverty, Foster Care, and Adoption, 60 Ohio St. L.J. 1189 (1999). Implicit in the emphasis on the duration of the children’s stay in foster care is the flawed notion that their time in foster care was prolonged because their parent did not comply with the Implan for reunification. The Department has virtually unfettered control over when or if a child is removed from the foster care system and restored to his parent’s custody. Considering these factors, it is not at all certain that the reunification of the Walters family stalled due to Ms. Walters’ dereliction in complying with the case plans. The facts suggest that the delay stemmed, at least in part, from the Department’s nebulous case plans, vacillating goals and misdirected assistance.
Supervision
The Department condemned Ms. Walters for inadequately supervising her children. When Ms. Walters was unable to care for her children due to her incarceration, she turned to her family for assistance. Her family surrendered the children to the Department’s care when they were financially unable to care for them. Thus, poverty played a significant role in the development of this proceeding. When considering alternative placements for the children, the Department first considers the children’s family. In this case, the family’s financial situation made them unsuitable candidates to be temporary custodians of the children, thereby forcing placement with strangers. Once Ms. Walters was released from jail, this problem was dissipated. However, her children were not returned to her.
Supervision by relatives is extremely common in lower income or single-parent families where financial limitations make *168 licensed day care facilities cost-prohibitive. Annette R. Appell, Protecting Children or Punishing Mothers: Gender, Race, and Class in the Child Protection System, 48 S.C.L.Rev. 577 (1997). Recent demographic studies indicate that over twenty-five percent of American children are raised in single-parent households. Trox-el, 530 U.S. 57, 120 S.Ct. 2054 (citing U.S. Dept, of Commerce, Bureau of Census, Current Population Reports, 1997 | n Population Profile of the United States 17 (1998)). Understandably, in “single parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday task of child rearing.” Id.
Removing children from their parents and family because of poverty creates socio-economic bias vis-a-vis parental rights. With increasing frequency, termination proceedings are subject to cultural and class biases because the parents subject to termination proceedings are often poor, uneducated, or members of minority groups. Santosky, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. The courts may not terminate a parent’s fundamental interest and rights in her children based solely on her poverty. State in the Interest of Ardoin, 95-839 (La.App. 3 Cir. 12/20/95); 667 So.2d 1144, writ denied, 96-796 (La.5/17/96); 673 So.2d 609. While the Department is powerless to mandate the sterilization of poor, uneducated single women, its insidious plan of terminating the parental rights of these women, largely because of their financial, educational and marital status, compels essentially the same result. In so doing, the Department has abdicated its role as the champion of family unity and child protection and has instead become an adoption brokerage which strips poor, uneducated women of their children in order to place them with more affluent, or less impoverished families.
In order to refine Ms. Walters’ parenting skills, the case plans required that she attend parenting classes. At the review of her progress with the plans, OCS reported that its funding for the parenting classes had been reduced. Ms. Louella Hornsby, an OCS case worker assigned to Ms. Walters, testified that OCS “could not find parenting classes.” Since parenting classes would not be available to Ms. Walters, that component was initially deleted from her case plans. When classes were later made available to Ms. Walters, she attended all but one of the sessions.
|1?We note that Ms. Walters was afforded limited opportunity to improve and demonstrate her parenting skills after the children were placed in foster care. Eventually, she was permitted to keep the children overnight in her home on weekends and holidays. Ms. Hornsby testified that Ms. Walters kept a clean home and adequately supervised her children during these visits.
C.D.W. and S.M.W. were placed with Ms. Walters for a trial placement on August 27, 1997 and September 12, 1997 respectively. OCS reports that in January 1998, a petition was filed in district court to have C.D.W. declared a delinquent child based on charges of simple criminal damage to property (breaking windows) committed in “August 1997.” In March 1998, he was adjudicated a Delinquent Child in Need of Rehabilitation, placed on probation, and later consigned to Boys Village. As a result of this event, S.M.W. and C.D.W. were removed from her care.
The dates in the Department’s brief to this Court are curiously vague. OCS reports that C.D.W. was in his mother’s custody the month of his criminal act, but the specific date of his transgression is noticeably absent. On first glance it appears that his criminal act was committed during C.D.W.’s trial placement with his mother, but, after combing the record, we discovered that this act occurred between August 13 -18, 1997. During this period, C.D.W. was in the care of his foster family, but had a weekend visit with his mother from August 15-17, 1997. It is unclear whether his act of vandalism occurred while he was *169 with his mother or his foster family. It thus becomes evident that OCS intentionally distorted the dates of these events in order to cast doubt on Ms. Walters’ supervisory and parenting skills. Their mis-characterization of these events treads dangerously close to deliberate deception.
[ 1sAfter considering Ms. Walters’ circumstances and the manner in which she supervised or provided supervision for her children, we conclude that she substantially complied with the supervision requirement of her case plans.
Informing the Department of Changes
Ms. Walters was required to inform the Department of changes in her living arrangements and of developments in the children’s lives when they were in her care. The case assessments compiled by OCS indicate that she complied with this component of the case plans, but that her notifications were “delayed.” The duration and causes of the alleged delay are not explained.
We note that the case plans did not articulate the time frame for providing the requested information. Where time limits are not defined by the parties or by statute, courts impose a reasonableness requirement on the time for performance. See State through Dep’t of Transp. and Dev., 555 So.2d 1355 (La.1990); Slocum v. Slocum, 97-1569 (La.App. 3 Cir. 4/8/98); 712 So.2d 930. The State bears the burden of proving each element of a ground for termination. La.Ch.Code art. 1035. Nothing in the record indicates that Ms. Walters unreasonably delayed in providing the requested information to the Department. Because Ms. Walters was simply required to provide information, which she did, we find that she complied with this prong of the case plans.
Psychological Evaluations and Counseling
Ms. Walters was required to submit to psychological evaluations and counseling. She attended several .counseling and evaluation sessions from 1996 — 1998. The record shows that she faithfully attended and participated in these |usessions, missing only one of five sessions in 1996. These facts establish that Ms. Walters satisfied this requirement.
Problems Preventing Reunification Education
The case plans called for Ms. Walters to enhance her education. The trial court also ordered her to get her general equivalency diploma (GED). At the time the Department first became involved with her family, she had only a tenth grade education. Ms. Walters earned her GED, satisfying the education requirement of the case plans.
Employment and Housing
The Department found that Ms. Walters did not have adequate, permanent housing and partially based its decision to keep the children in foster care on this finding. Although inadequate housing was identified as a factor to justify placing the children in foster care, we find no evidence in the record that OCS assisted Ms. Walters in securing satisfactory housing. Rather than assist Ms. Walters in securing stable housing, the State merely imposed increasingly onerous conditions on her.
-In order to satisfy the housing and employment components of her ease plans, Ms. Walters took a seasonal job at a construction company working seven days a week so that she could afford rent on “adequate” housing, a large mobile home. Because the Department decided that her job did not qualify as stable employment and would prevent her from being able to provide adequate supervision of the children, Ms. Walters secured two jobs, earning substantially less money, in order to be more available for her children. The subsequent reduction in her income rendered hsher unable to pay rent on the home, so she moved into a smaller mobile home within her budget. The Department said the home was too small, which prompted Ms. Walters to move in with friends in *170 order to save money from her low-wage jobs so that she could afford the rental payments on a larger mobile home. Once she secured an affordable home which satisfied the housing standards set by the Department, the Department again refused to return the children to their mother based on her instability in securing and maintaining permanent housing and employment.
The Department’s reliance on Ms. Walters’ “unstable” housing history as part of the grounds for terminating her parental rights is egregious error. Any instability here was in the case plan requirements; Ms. Walters merely complied with the fallacious plans because she was led to believe doing so would facilitate the return of her children. By imposing antithetical requirements, the Department made it extremely difficult for Ms. Walters to satisfy both the employment and housing components of her case plans. The Department cannot rely on compliance with banal case plans in order to prove grounds for terminating parental rights.
On the surface, it appears that Ms. Walters’ living arrangements were unstable; however, close scrutiny beyond the thin veneer of the Department’s arguments clearly shows that Ms. Walters modified her living arrangements in order to satisfy the escalating goals established by the Department. Notably, she has maintained her current residence for over two years. We find that Ms. Walters complied with the Department’s requirements regarding her living arrangements, despite the fact that the standards were invariably amended as soon as she met them.
Regarding her employment history, it is readily apparent that Ms. Walters has found it difficult to maintain steady work. We note that her employment at various jobs ended for different reasons, including a layoff, a complaint regarding |1fiher behavior outside of work and financial miscalculations. Commendably, whenever she lost a job, Ms. Walters immediately secured another.
We observe that the Department did not assist Ms. Walters with securing stable employment. When asked whether OCS ever attempted to help Ms. Walters obtain stable employment, Ms. Hornsby testified, “No, we did not.”
“Two interests are at stake in parental rights termination proceedings — a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings.” Santosky, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599. Although the Department’s goal is to secure a permanent home for the children, “while there is still reason to believe that positive, nurturing parent-child relationships exist, the parens patriae interest favors preservation, not severance, of natural familial bonds.” Id. at 1401-1402.
“Environmental neglect” such as the lack of adequate food, shelter or clothing and inadequate supervision is a resource problem and not indicia of abusive or neglectful parents. Cahn, 60 Ohio St. L.J. 1189. These problems could be readily addressed by increasing the financial resources available to the family. The Department did not provide guidance to Ms. Walters in securing the resources she apparently lacked. Instead, the Department demanded that she improve her station in life by conforming to their lofty expectations in a vast array of areas.
Persistence of Conditions Causing Removal
The conditions that motivated the initial removal of the children from Ms. Walters’ custody were allegations of abuse and her incarceration. We now |17consider whether these conditions are so persistent as to compel the termination of Ms. Walters’ parental rights.
In 1995, the Department took custody of the children following reports that they were abused and neglected. Specifically, *171 it was reported that E.S.W. had bruises and other marks suggestive of cigarette burns on his back and buttocks. Terry Manuel, a Child Protection Investigator, investigated the report and concluded that the small scratches on E.S.W.’s back were from a bicycle accident. Mr. Manuel reported his findings in an affidavit filed on December 20,. 1995. That affidavit was amended without substantive changes on April 18, 1996. It was found that the children were not abused. The Department has not shown that the children suffered any substantive harm while in their mother’s care. In fact, there is no evidence that Ms. Walters either abused or negligently condoned the abuse of her children. Thus, the Department has failed to prove this prong of its claim.
There is a strong correlation between a family’s poverty and allegations of abuse and neglect foreshadowing a petition to terminate parental rights. See Cahn, 60 Ohio St. L.J. 1189; Kathleen A. Bailie, Note, The Other “Neglected” Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them, 66 Fordham L.Rev. 2285 (1998). Careful scrutiny of the record discloses that the allegations of abuse were unproven, but the Department determined that the children should reinain in the State’s custody due to conditions deriving from their family’s poverty.
The Walters children were placed in foster care due, in part, to inadequate supervision during Ms. Walters’ incarceration. Soon after her initial release, Ms. Walters was again briefly incarcerated for matters related to her initial incarceration. She was released from jail on probation. The conditions of her |1sprobation require her to pay restitution for her crimes and to submit to regular drug testing. While paying restitution, she fell behind when the Department demanded she change jobs in order to fulfill competing requirements. She regularly submitted to drug testing. After testing positive for marijuana soon after her release, she began regularly testing negative for drug use. The OCS assessments indicate that Ms. Walters has complied with the terms of her probation and this portion of her case plans. Further, she has not demonstrated a pattern of incarceration that makes her unfit to parent her children.
The removal of the children stemmed from an isolated instance in which Ms. Walters was unable to render care for them because she was incarcerated and impoverished. That singular event unleashed a flood of State action in the lives of the Walters family. The clear and convincing standard employed in parental termination cases is meant to alleviate the risk that the factfinder will deprive a parent of the care and custody of his children based solely on a few isolated instances of unusual conduct. See Santosky, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. After her release from jail, Ms. Walters made steady improvements in her parenting and life skills. Both the Department and the trial court discounted the merits of these accomplishments.
Taken to its extreme, a, practice premised upon a myopic comparison of families would mandate the extraction of all chilr dren from the homes of impoverished and undereducated parents in favor of placement in homes of only those persons with high intelligence who can assist them with their schoolwork, with the financial means to provide a nice home and fashionable clothes, and who can afford to stay home and personally supervise them.
|19 When asked whether Ms. Walters had substantially complied with a case plan designed to reunite her family, Ms. Horns-by, who was assigned by OCS as Ms. Walters’ case worker, became extremely belligerent and refused to answer the question. After a heated debate, the court ordered Ms. Hornsby to answer the question, and she reluctantly admitted that Ms. Walters had complied with at least eight of the ten requirements of the case plan. Regarding a later plan, Ms. Hornsby testified — when the court forced her to an *172 swer — that Ms. Walters complied with nine of the ten requirements. Ms. Horns-by stated that Ms. Walters did not satisfy the tenth requirement because the information Ms. Walters provided was “delayed.”
“The state has an obligation to make ‘reasonable efforts’ to preserve and to reunify a family, to prevent or eliminate the need for removal of the child to foster care and to make it possible for a removed child to return home.” Judge Ernestine Steward Gray, The Adoption and Safe Families Act of 1997: Confronting an American Tragedy, 46 La.B.J. 477, 479 (1999). After reviewing the interaction between the Department and the Walters family, it is difficult to find that the Department exerted reasonable efforts to reunite this family. The Department’s actions show only minimal assistance was rendered to Ms. Walters to redress identified problems; rather, the Department’s plans reek of administrative convenience apparently designed to keep the children in foster care while placing practically insurmountable hurdles between them and their mother. Ms. Walters was forced into a cookie-cutter program allegedly designed to ameliorate problems in her parenting ability and bring her parenting skills closer to the Department’s vision of the norm.
The Department argues that Ms. Walters did not benefit from the programs and plans it assigned for her. The standard in Article 1015(5) is not]a“benefit”; rather, it is substantial compliance. The emphasis on whether she benefitted from the case plans is misplaced. Clearly, Ms. Walters substantially complied with the case plans: she has adequate living arrangements, has tested negative for drugs, is earning a stable income, and has maintained close relationships with her children. When, after a parent substantially complies with the Department’s demands and conforms to its expectations, the Department finds the results unsatisfactory, then the fault most likely lies with the demands rather than with the parent. The failures identified by the Department are more indicative of deficiencies in its programs and case plans than in Ms. Walters’ abilities.
“Given its limitations, the state should be careful to focus on child protective issues rather than maternal make-overs.” Appell, 48 S.C.L.Rev. 577, 600. A cookie-cutter program designed to address generic family needs is inherently flawed because it is unlikely to address the family’s vital needs. “The problems [of the family] become interchangeable, the serious ones indistinguishable from the minor ones; and needs are generalized and defined according to what services are currently available.” Id. at 601.
Perhaps the Department uses a formulaic approach to assisting families because it is the most efficient way to address a large volume of family crises. However, this approach is frequently inadequate to meet the rudimentary needs of the family. By directing a parent’s attention to a fixed set of problems, the Department unwittingly limits the time and resources the parent has with which to address the premier problems facing her family. This protracted systematic approach to rendering family assistance creates a significant risk of an erroneous deprivation of parental rights. The efforts by the Department to reunite the Walters family were hindered by plans which accommodated administrative convenience and, perhaps, the Pi financial incentive provided by the federal government to move children from foster care to adoptive families.[2] The Department should employ meaningful programs designed to help the family remain intact or to reunify the family after a necessary separation. The programs and case plans reviewed here did not pursue this purpose.
REASONABLE EXPECTATION OF REFORMATION
The third element that must be proved for termination under Article *173 1015(5) is the unlikelihood of a reasonable expectation of improvement in the parent’s conduct or condition in the near future. Reformation requires that a parent demonstrate significant improvements in the conditions that served as the basis for the removal of the children from the home. State in the Interest of Broussard, 94-1613 (La.App. 3 Cir. 5/3/95); 657 So.2d 121. “[A] reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.” State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993); State in the Interest of D.D., 94-1404 (La.App. 3 Cir. 2/15/95); 650 So.2d 447. The evidence necessary to prove an unlikelihood of reformation is set forth in La. Ch. Code art. 1036(D):
Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
1 r!>(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The Department contends that Ms. Walters’ reformation in the near future is unlikely because she suffers from mental illness and has a history of substance abuse and repeat incarcerations. We disagree.
Mental Illness
Ms. Walters and her children submitted to several psychological evaluations from 1996 — 1998. In 1996, Dr. Sam R. Williams, a psychologist with The Psychology Clinic, found Ms. Walters to be a slow learner who is needy, immature and dependent on others. Dr. Williams reported that although Ms. Walters is cooperative in counseling and affectionate towards her children, she is at risk of neglecting or passively abusing her children. His conclusion was based on his findings that she is a slow learner who is easily overwhelmed, has low self-esteem, that she is immature, needy and lacks insight. He said it is more likely that she will be a follower than a leader.
Dr. Ann Menou, another psychologist with The Psychology Clinic, reported on her conclusions about Ms. Walters in 1998. Dr. Menou said Ms. Walters had limited intellectual abilities and a limited understanding of her children’s poor academic performance. She further concluded that Ms. Walters was tense, restless, fearful and worried. Dr. Menou recommended that Ms. Walters be referred to a | ¡^physician for medication to assist with her anxiety and suggested therapy to augment Ms. Walters’ skills with coping with problems.
The Louisiana Supreme Court discussed the standard for terminating parental rights based on mental illness in State in the Interest of J.A., 99-2905, p. 15 (La.1/12/00); 752 So.2d 806, 814:
We note that a finding of mental illness, standing alone, is insufficient grounds to warrant termination of [the parent’s] parental rights. Instead, the mental deficiency must be related to the parenting ability. That is, if the evidence provides clear and convincing evidence that the prognosis for [the parent’s] recovery in the near future is poor *174 and there is no reasonable expectation of significant improvement in her condition in the near future, then termination is proper if it is in the best interests of the child and the additional grounds for termination have been met.
(Citations omitted). In that case, the mother suffered from chronic schizophrenia which made her incapable of caring for her child. The instant case is distinguishable. Dr. Williams admitted that Ms. Walters did not demonstrate a formal thought disorder. She is simply a person of limited intelligence. Ms. Walters’ alleged mental illnesses are personality traits, such as being self-absorbed and narcissistic, and largely a product of her limited education. These traits do not rise to the level of mental illness commanding a termination of parental rights.
The Department observes that Ms. Walters’ mental status did not improve with counseling. Several of the assessments by OCS of Ms. Walters’ progress in psychological counseling indicate that she was not responding to counseling. Rather than modify the plan, the Department continued to employ methods that by its own standards were failing. Accordingly, we conclude that the evidence does not support the judgment that Ms. Walters suffers from a mental illness that makes her incapable of parenting.
| ¡.¿Pattern of Incarceration
Part of the reason the Department removed the children from Ms. Walters’ custody was because she was unable to care for them during her incarceration. After a brief return to jail immediately following her release, Ms. Walters has not been reincarcerated. As discussed above, she is on probation and is making restitution for her crimes.
We have previously held that reformation was unlikely, and termination is appropriate where a mother fails to comply with her case plans and makes only “diminutive efforts to improve her economic and domestic predicament in order to establish not only her ability but also her sincere desire to provide the most basic essentials of a safe, nurturing home environment for her children.” State in the Interest of M.L., C.L. and D.L., 00-153 (La.App. 3 Cir. 5/3/00); 761 So.2d 103. That is not the case here. The record indicates that OCS found Ms. Walters increasingly cooperative and found that she was making steady improvement. Her visits with her children progressed from one hour supervised visits at the Civic Center to unsupervised, overnight visits in her home. After her release from jail, Ms. Walters advanced from living with friends to securing a home sufficient to accommodate her family comfortably. An OCS case worker testified that Ms. Walters substantially complied with the requirements of her case plans. A mother’s substantial compliance with the prongs of case plans developed to reunite her with her children indicates that she has reformed. Cf. State in the Interest of C.L.R. v. Russo, 567 So.2d 703 (La.App. 3 Cir.1990).
| ^Best Interest of the Children
The Supreme Court of Louisiana has observed: ‘While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the children.” State in the Interest of S.M., 98-922, p. 15 (La.10/20/98); 719 So.2d 445, 452. The court also recognized that “a child has an interest in the termination of rights that prevent adoption and inhibit that child’s establishment of secure, stable, long term, continuous family relationships.” Id.
A trial court may terminate parental rights after finding that the Department has proven all elements of a ground for termination under Article 1015(5) and that the termination is in the best interest of the child. La.Ch.Code art. 1037. Because we find that the Department failed to prove all of the mandatory elements of *175 Article 1015(5), we are foreclosed from considering whether termination would otherwise be in the best interests of the children.
IV.

CONCLUSION

Once the Department identifies a family and removes the children from the parent’s care, the Department does not extricate itself until either it is satisfied that the conditions that led to the initial intervention are corrected or that it is unlikely that the conditions will improve and moves to terminate the parent’s rights regarding the children. In this case, the Department improperly selected the latter option as the means for extrication; the children should have been returned to their mother because the conditions that begot the Department’s involvement have been rectified. This [^finding renders null the issue concerning Ms. Walters’ access to her children following termination.
Based on our comprehensive examination of the record, we find that the Department did not prove all elements of Article 1015(5) by clear and convincing evidence. The Department selectively focused the trial court’s attention on the most detrimental fragments of this family’s history while virtually ignoring the mother’s strengths and improvements. The Department proved only that at least one year has elapsed since the children were removed from Ms. Walters’ custody. It was not established that she failed to comply with the requirements of her case plans or that her reformation is unlikely. Termination of parental rights is inappropriate where the Department fails to prove all three elements for termination under Article 1015(5) by clear and convincing evidence. See State in the Interest of L.L.Z., 620 So.2d 1309.
For these reasons, the judgment of the trial court is reversed. We remand this case to the trial court to allow it to determine the proper placement of the children in a manner consistent with the views expressed herein.
Costs of trial and appeal are taxed against the Department of Social Services in the amount of $2,778.00.
REVERSED AND REMANDED.
YELVERTON, J., Concurs in the Result. PICKETT, J., Concurs.

. Although there are cursory references to earlier instances in which the Department was involved with the Walters family during 1991 and 1992, those events were not made a part of this suit.

. See 42 U.S.C. § 673(b).