815 So.2d 1035 (2002)
STATE in the Interest of V.F.R., S.R.Juvenile.
No. 01-1041.
Court of Appeal of Louisiana, Third Circuit.
February 13, 2002.
Writ Denied April 12, 2002.
Jacquelyne Joe Heinen, Office of Community Services, Lake Charles, LA, Counsel for Plaintiff/Appellee V.F.R. (child).
Cecil Raymond Sanner, Cameron, LA, Counsel for Plaintiff/Appellee State of Louisiana.
Frank C. Miller III, Lake Charles, LA, Counsel for Defendant/Appellant V.S.R. (mother).
*1036 Court composed of JOHN D. SAUNDERS, OSWALD A. DECUIR, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
In this case, the defendant, V.R., appeals the judgment of the trial court terminating her parental rights to S.R. in favor of the State of Louisiana.[1] For the following reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
The State's involvement in V.R.'s family began in March 1998, relative to her older daughter V.S.[2] S.R. was born on December 5, 1998, while the State was providing services to V.R. and V.S. In March 1999, the State filed a petition declaring that S.R. and her sister were neglected and abused children in need of care, and the children were removed from the home. In June 1999, the trial court found that S.R. was a neglected child in need of care and placed her in the custody of the State. V.R. was ordered to, and did successfully complete, a twenty-eight day in-patient substance abuse treatment program. In February and April 2000, the trial court determined that the best interests of S.R. would be served by her continuing in the custody of the State. However, at an August 2000 hearing, it was decided that S.R. would be returned to the home of her mother on a trial basis, although custody would remain with the State. At that time, V.R. was ordered to refrain from drinking alcohol and engaging in violence with the live-in father of S.R. Thereafter, in September 2000, S.R. was completely released from State custody and supervision.
On January 29, 2001, after the State received reports that V.R. was intoxicated at a local festival while S.R. was in her custody, an instanter order was issued by the trial court and custody was granted to the State. The evidence supporting the order further revealed that V.R. was arrested in March 2000, for disturbing the peace and public intoxication, the police were called out to V.R.'s residence in April and September 2000, for domestic disturbance issues, and in November 2000, V.R. was arrested for DWI. In January 2001, V.R. was arrested for public intoxication and driving with a suspended license, was noted having S.R. in her custody while intoxicated, and was involved in another domestic disturbance that resulted in the police coming out to the family home.
In March 2001, the State filed a petition for certification of adoption and termination of parental rights pursuant to La. Ch.Code art. 1015(5), which stated:
By court order, the child was placed in the State's custody on or about June 16, 1999[,] and remained in State's custody until September 6, 2000. She re-entered State's custody on January 24, 2001, and has remained in custody. The court approved a case plan for services for the safe return of the child but the parents have made no substantial parental compliance....
A judgment was rendered by the trial court on March 20, 2001, declaring S.R. a neglected child in need of care and custody was continued in the State. After a trial on the merits on May 30, 2001, V.R.'s rights were terminated. Thereafter, V.R. timely appealed.

LAW AND DISCUSSION
We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting *1037 great deference and vigilant protection under the law." In re J.K., 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. See also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. Lassiter v. Department of Social Servs. of Durham County, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under Article 1015 before a judgment can be issued terminating parental rights. In re J.K., 702 So.2d 1154. If the State meets this burden, the trial court then determines if it is in the best interests of the child to terminate the parent's rights. La.Ch.Code art. 1037.
This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repetitively held that the interests of the child are paramount over that of the parent. In re J.A., 99-2905 (La.1/12/2000), 752 So.2d 806. In In re of J.A., the supreme court stated:
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.
Id. at 811 (citations omitted).
Whether a parent's rights should be terminated because she has failed to provide for her child is a question of fact, and the trial court's determination regarding termination of parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. In re S.M.W., 00-3277 (La.2/21/01), 781 So.2d 1223.
The judgment terminating V.R.'s parental rights indicates that the termination was pursuant to Article 1015(5). Article 1015(5) states:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
To reiterate, the State "bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." La.Ch. Code art. 1035(A). Additionally, the requirements of La.Ch.Code art. 1037(A) must be satisfied. It states:

*1038 When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven true by the evidentiary standards required by Article 1035 and that it is in the best interest of the child, it shall order the termination of the parental rights of the parent against whom the allegation are proven.
(Emphasis added).
Thus, we address whether the State proved, by clear and convincing evidence, that (1) the grounds in Article 1015(5) were met and (2) whether the termination was in the best interest of S.R.

La.Ch.Code arts. 1015(5) and 1004.1
V.R. urges that Article 1015 lists the exclusive grounds for terminating parental rights, that less than a year has elapsed since the most recent removal from parental custody, and the trial court did not express any opinion, much less approval, of this shorter time frame between removal and termination. V.R. urges that the trial court mistakenly relied upon the previous removal of S.R., which began in June 1999, and ended in September 2000, when the State completely released V.R. from state supervision.
While we agree that it would be erroneous to consider the June 1999 September 2000 period as part of the one year period in Article 1015(5), we find that, pursuant to La.Ch.Code art. 1004.1, the termination of V.R.'s parental rights was legally appropriate, despite the lapse of less than one year. La.Ch.Code art. 1004.1 states:
The department shall file and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interest of the child.
Comment (c), 1999, to Article 1015 states in pertinent part:
42 U.S.C. [§ ]675(5)(E) now requires the state department to file a petition to terminate parental rights when the child has been in foster care under the responsibility of the state for fifteen of the most recent twenty-two months.... There are only three exceptions to this mandate: if the child is being cared for by a relative; if the department has documented in the case a "compelling reason" that termination of parental rights is not in the best interests of the child; or that the department has not provided necessary services for the safe return of a child when reasonable efforts to reunify a family are required.
S.R.'s custody was first placed in the State in June 1999, and lasted through September 2000. The State resumed custody in January 2001, and filed its petition in March 2001. Thus, the State was required to file its petition to terminate because S.R. had been in state custody for seventeen of the past twenty-two months prior to the filing of the petition.
Additionally, based on the evidence presented below, we find the trial court did not commit manifest error when it found that the State proved, by clear and convincing evidence, that there has been no substantial parental compliance with the case plan and there is no reasonable expectation of significant improvement in V.R.'s condition or conduct considering the child's age and her need for a safe, stable, and permanent home. The crux of V.R.'s case plan is that she "provide a safe and sober environment for her children to live in."
Roger Lafosse, the case manager, testified that he first became involved with the family on June 16, 1999. He stated that the State's involvement with the case *1039 ceased September 6, 2000, but began again on January 24, 2001, and continued up until the time of trial. Lafosse stated that V.R.'s case plan included 1) attending a twenty-eight day in-patient program to address her alcoholism, 2) attending Alcoholics Anonymous (AA) meetings, 3) obtaining a stable home and job, and 4) supporting her children. Lafosse testified that V.R. did attend the twenty-eight day program, but only attended one or two AA meetings. He further testified that V.R. was unable to remain sober according to police accounts and her own admissions. Lafosse further testified that, though V.R. has made efforts, she has not successfully accomplished rehabilitation. He also stated that S.R. has remained in the same foster home from June 16, 1999, to June 14, 2000, and from January 24, 2001, until the time of trial.
Dr. Ann Menou, a psychologist, evaluated V.R. in May 1998, before the birth of S.R., due to a referral by the family services worker who became involved because of physical alterations between V.R. and her older daughter. She stated that both mother and daughter reported extensive problems related to V.R.'s alcohol abuse, including physical alterations. V.R. also reported to Dr. Menou that her daughter would take care of her when she got "sloppy drunk." Dr. Menou diagnosed her with alcohol dependence.
Deputy Chris Savoie of the Cameron Parish Sheriff's Office, responded to the festival incident in January 2001. He stated that V.R. was holding S.R. and came toward him swaying severely and stumbling, and that she could hardly walk or talk, much less care for an infant. Deputy Savoie stated that V.R. asked for a ride and that, because she was highly intoxicated, he decided that S.R. would be better left in the care of someone else. Therefore, he transported V.R. and S.R. to their residence so that V.R.'s older daughter could watch S.R. However, as no one was home, a neighbor (B.V.) was asked to watch the child and not to return her to V.R. until she sobered up. However, Deputy Savoie was later informed, when he was called out to V.R.'s residence for a domestic dispute, that she took S.R. immediately after he had departed from the scene. Deputy Savoie also stated that he has seen V.R. around town intoxicated on many occasions. He did state that he has not been involved with any disputes or alcohol related incidents involving V.R. in the past few months.
Deputy Joey Babineaux, Jr., also of the Cameron Parish Sheriff's Department, testified that he last made contact with V.R. in March 2001, when he was called to a neighbor's residence to assist in having V.R. returned to her own residence because she was intoxicated and was trying to go to the local convenience store to purchase more alcohol. Deputy Babineaux indicated that V.R.'s intoxication was evidenced by her slurred speech, swaying while standing, and a strong odor of alcoholic beverage on her breath. He also stated that V.R. asked if he was going to file a report on this incident because she was trying to get her child back. He further stated that he listened in on a phone conversation in which V.R. called the neighbor who had called the police in the first place, asking for a sleeping pill. Deputy Babineaux stated that this is the last incident he was aware of involving V.R. He also stated that the home appeared clean and livable, and that the children appeared well fed.
G.V., V.R.'s next-door neighbor and B.V.'s mother, stated that she saw V.R. that same night and she described her as "pretty well intoxicated." She also testified that she had spoken with V.R. on several occasions about how her drinking *1040 could affect her parenting abilities. She further testified that V.R. has not stopped drinking since that incident and that she has appeared at her home intoxicated on several occasions. She stated that she last saw V.R. the weekend before court commenced and that V.R. was intoxicated on that day and carrying a can of beer in her hand. She also stated that V.R. asked her to lie in court, but she refused. Finally, she testified that when she is not drinking, V.R. is a very good parent.
V.R. testified that she has not had anything to drink since the January 2001 incident and that she is able to support her daughter. V.S. testified that her mother takes great care of S.R. and that her mother's drunken episodes have not endangered S.R. She also stated that the last time she saw her mother drink was at the festival in January 2001.
In its oral reasons terminating V.R.'s parental rights, the trial court stated:
I see in the testimony the same sort of denial and, I must point out, fabrication. There is ample evidence to see that contrary to [V.R.]'s testimony that she hasn't drank for eight and a half months, that's not true. So, she has to be untruthful to try to cover her alcoholism.
I know that she cannot control her alcoholism. This leads me to the conclusion that [S.R.] would still be at risk if returned to her care, and that as [V.S.] got older and became independent, that [S.R.] would be relied upon at a much earlier age than tolerable to become the caretaker for her mother.
Along the way, there is always the risk that we know that children just need an adult to be present, and she cannot fulfill the functions of a responsible adult when under the influence, and I do not feel like she has whipped that demon and can keep herself in a sober condition.
We find that the trial court's findings summarize the precise reasons why the termination of V.R.'s parental rights was appropriate and in the best interests of S.R., who has spent the majority of her young life in foster care. The extent of V.R.'s compliance is that she completed a twenty-eight day in-patient program and found a job. She has not attended any follow-up care and it is plainly evident that she has not been able to make any substantial improvement in controlling her alcoholism. Public intoxication at festivals and DWI arrests do not tend to support a finding that V.R. is working toward recovery. While we do not downplay the difficulty a person can experience in beating a long-term addiction, we agree with the trial court that a young infant should not be subject to these trials and errors, which place her safety and welfare at risk.
V.R. urges that no evidence was presented that her alcoholism resulted in "any harm, injury, abuse, or neglect" of S.R. We strongly disagree. The evidence is replete with instances where V.R.'s intoxication placed S.R. in harm's way. Further, the evidence indicates that V.F., a young teenager, provided substantial "parental" care for V.R. As the trial court observed, this burden may be placed at an early age on S.R. once V.F. becomes independent. Moreover, a parent whose mental faculties are often impaired by mind-altering substances cannot be said to be in a position to provide a child with the attention and affection necessary to ensure that the child has an emotionally and physically beneficial upbringing. Maybe V.R. said it best when she described the situation: "Norman Rockwell, it is not." We do not find that V.R. made any measurable steps toward creating a "safe and sober environment" for S.R. to live in. The evidence strongly refutes her claim that she has been sober since the January festival incident. *1041 Therefore, we hold that the trial court correctly found that it was in S.R.'s best interest that V.R.'s parental rights be terminated.

CONCLUSION
We find that the State has proven, by clear and convincing evidence, the factors necessary to terminate V.R.'s parental rights to her child, S.R., and she is released for adoption. Costs of this appeal are assessed against the defendant-appellant, V.R.
AFFIRMED.
SAUNDERS, J., dissents and assigns written reasons.
SAUNDERS, J., dissenting.
Due to the serious and extreme nature of the termination of parental rights and in light of the progress shown by the child's mother, I would not terminate parental rights. Accordingly, I respectfully dissent from the majority's opinion.
Under Article 1015(5) of the Children's Code, one element that must be proved for the termination of parental rights is the unlikelihood of a reasonable expectation of improvement in the parent's conduct or condition in the near future. La.Ch.Code art 1015(5). A reasonable expectation of improvement or reformation "... is found to exist if the parent has cooperated with the state officials and has shown improvement, although all of the problems that exist have not been eliminated." In re S.M.W., 00-308, p. 21 (La.App. 3 Cir. 8/9/00); 771 So.2d 160, 173.
A review of the record indicates that, although V.R. continues to struggle with alcohol addiction, she has made some improvement. V.R. has successfully completed a 28 day treatment program, has found a job, has attended some of her AA meetings, and has completed anger management classes. V.R. has also ended her traumatic and sometimes violent relationship with her ex-husband. Furthermore, the State's own psychologist, indicated that these actions were positive steps toward maintaining her sobriety.
The record indicates that V.R. is not a perfect parent, but it does show a parent progressing step by step in the right direction towards providing a suitable environment for her children. Accordingly, I find that the state has not proven the unlikelihood of a reasonable expectation of improvement in V.R.'s conduct or condition. Thus, I would reverse the finding of the trial court.
NOTES
[1] Initials are used throughout to protect the privacy of the juveniles.
[2] V.S. is not a party to this appeal.