636 So.2d 1186 (1994)
STATE of Louisiana in the Interest of JL, DL, and SL.
No. 93-352.
Court of Appeal of Louisiana, Third Circuit.
May 18, 1994.
*1187 Leah Antoinette Beard, Lafayette, for State.
Linda Anne Coltharp Veazey, Abbeville, for Birdie Levine.
Ted L. Ayo, Abbeville, for Curvie Nunez.
Before LABORDE, COOKS and DECUIR, JJ.
COOKS, Judge.
In this parental rights termination case, the mother of three children and the father of one of them appeal a lower court's decision forever severing their relationships with the children. The children are referred to by initials to preserve their anonymity in this confidential proceeding. The children were placed initially in the custody of the State and allowed to reside with foster parents. Two years later, the State filed a petition seeking to terminate the parental rights of the mother and the alleged fathers of the children. All males identified by the mother *1188 as possible biological fathers denied paternity, except the named father of SL.
Pursuant to provisions of the Louisiana Children's Code Article 1015(5) the State alleged the mother was unfit to regain present parental control of the children and no reasonable expectation existed that she would "reform" within the foreseeable future. The State also alleged as grounds, according to Children's Code Article 1015(8), and (9), the fathers of the children deserted and/or abandoned them by failing to either formally or informally acknowledge them; by failing to contact them for a period of at least four months; and, by failing to provide care and support to them without just cause, thus demonstrating an intention to permanently avoid their parental responsibilities. Further, the State claimed the "best interest of the children" favored termination of parental rights.
At the termination hearing, the mother appeared and voiced strong objection to the proceeding. Admitting a long history of drug and alcohol abuse, she presented the testimony of friends and family to show she was trying very hard to cope with her problems and to provide a stable home for the children. Only the father of SL appeared and objected to the termination proceeding. He expressed a willingness to formally acknowledge and fully accept his parental responsibility for SL.
The trial judge later found the State carried its burden of proving by "clear and convincing" evidence the mother's parental rights should be terminated. However, he initially expressed "second thoughts concerning" terminating the father's parental rights; but, he ultimately concluded SL's father "took no action to establish any kind of relationship" with her after receiving notices from the State during the period he was not incarcerated. The child's best interest, he reasoned, required termination of the father's parental rights. The mother and the father filed this appeal urging the trial court's judgment terminating their parental rights was erroneous for two reasons.
First, the mother contends the evidence demonstrates a reasonable expectation existed that she "could and did" reform her behavior and improved her parental skills. She argues her efforts, in this regard, were sufficient to rebut the State's petition to terminate her parental rights. Citing the made for television movie "Lies and Lullabies," the mother suggests just like the character in this drama, she has struggled to overcome her drug addiction and to "win her children back." She fears her story, unlike the movie, will not end with a happy scene because the State reneged on its promise to return the children after she "kept her part of the bargain."
Second, the father of SL, admits his shortcomings; but, he urges the State failed to show he intended to permanently avoid parental responsibility for his daughter. He points out during a substantial portion of the period between the child's birth and the termination hearing, he was incarcerated. He complains the State did not contact him regarding either the birth or taking care of the child until long after she was adjudicated "neglected" by the mother. He denies immediate awareness of the child's premature birth; and, he stated at this time he was incarcerated. When informed the child was in the State's care, the father visited her in May, 1991. The record reveals for the first time on June 1, 1991, a Social Services Specialist telephoned the father requesting to meet with him to discuss the child. Except for a follow-up letter dated August 30, 1991, requesting that he contact the Social Services Counselor, all efforts to contact the father were aborted for nearly eight months because the mother indicated she was not "comfortable with" placing the child in the father's or his mother's care. On April 8, 1992, the State resumed its efforts to contact the father by letter only. The letters addressed to the father after April, 1992 were signed by members of his family or they were left "unclaimed." Thus, the father contends the State failed to make a "diligent search" for his whereabouts, particularly during the periods of his incarceration. He denies knowing the child was abandoned at birth by the mother; and complains the State did not advise him of the adjudication proceeding; nor did it advise during his first visit with SL that he could continue contact *1189 with the child either by visiting her at the foster home or at the local Office of Community Services. Further, he notes despite his mother's later visit with the child and expressed interest in caring for the child, she too was not given any schedule or otherwise directed to establish contact with the caseworkers.
While we agree with the trial judge that the evidence (as a whole) strongly and convincingly demonstrates the mother's parental rights should be terminated and such action is in the best interest of the children, the record similarly does not support termination of the father's right. To the contrary, we find the State's petition to terminate his rights is premature for the reasons hereinafter discussed.

FACTS
The record reflects SL was born too early on August 2, 1990. At birth, she was less than three pounds and suffered from respiratory distress syndrome requiring prolonged hospital care and administration of medication. It is unclear from the record what date the mother was released from hospital care after delivery of the child; but, shortly thereafter, she failed to return to the hospital or respond to repeated requests by the hospital that she attend CPR and medical support training classes. On one occasion, the hospital even sent a driver to transport the mother; but she was not present at the predesignated site and time. Finally, the hospital contacted the State, through the Department of Health and Human Resources, requesting assistance in locating the mother. Also unable to locate her whereabouts, the State requested an Instanter Order seeking removal of SL alleging the mother had neglected her by failing to return to the hospital. After a hearing on September 10, 1990, SL's custody was awarded to the State; and, it was directed to take steps to reunite the family and to supervise the mother's home. In furtherance of this assignment, the State continued its search for the mother. With the aid of a local police officer, the State discovered where the mother was residing. When a social worker arrived at her residence on October 14, 1990, JL (then only three years of age) was naked and left unsupervised in the yard. DL (approximately 11 months old) had visible sores on his legs. The worker noticed the home's electricity was supplied by use of an extension cord "running from" the home to the next door neighbor's residence. On entering the residence, the worker found the mother asleep. When she became coherent, the worker advised her of the purpose for the visit and instructed her to bring DL to the doctor the next day. However, the mother failed to seek medical care for the child's condition as agreed.
Again, requesting an Instanter Order, the State sought removal of JL and DL alleging "lack of supervision and medical neglect." Subsequently, DL was examined by a physician who diagnosed his condition as impetigo; and, confirmed he sustained bruising and a cigarette burn on the buttocks prior to placement with the State. After an adjudication hearing, all the children were found in need of care and their continued custody was awarded to the State. The mother was present at this hearing. None of the fathers received notice of the hearing; or otherwise acknowledged acquiring advance notice of this hearing. A detailed supervisory plan was ordered and the mother was directed to submit to certain conditions designed to assist her in avoiding the use of drugs and caring for the needs of her small children. At six-month intervals, the State reported the mother's progress and cooperation to the court; and, suggested it retain continued custody of the children.
The children were placed in the homes of foster parents. SL's special medical problems required extensive training by the foster parents whose efforts in sustaining and caring for the child after birth deserves applause. The mother, on the other hand, admittedly vacillated between showing minimal concern for her children and returning to the "street life" of a drug addict. Despite the State's encouragement and coaching urging her to participate in various rehabilitation programs and to find a permanent residence for the children, the mother confessed until perhaps February, 1992 she continued to abuse alcohol and smoked marijuana and *1190 crack cocaine daily. Agreeing to receive in-house treatment at Gatehouse Foundation, the mother's two stays were brief; and, she failed to complete the program. As explained by the director of the facility, the mother refused to avoid "male interaction" during these periods. An evaluation by her peers suggested that she was "still daydreaming or preoccupied about drugs and alcohol." Her attempts to attend AA (Alcoholics Anonymous) meetings also were sporadic; and, as testified, she attended the sessions only when she could obtain a slip verifying her presence. While she professed she was drug and alcohol free for nearly nine months prior to the termination hearing, she had abandoned all efforts to attend AA meetings or other rehabilitation programs.
Her effort to find a stable home for the children did not fare much better. For nearly two years she moved from "pillar to post" residing with male companions and her mother. Finally, just prior to the termination hearing, the mother moved into a government supported four bedroom apartment unit which she admitted was located in a "bad" area of town; and, she did not wish to permanently reside at this location. Relying on the financial assistance of male friends, the mother testified she was then unemployed. Her attempts to gain employment, earlier, also resulted in failure. She was employed by Wendy's Restaurant for a brief period; but, she quit the job.
Even though she visited the children while in the care of the State, her contact with them was strained; and, she spent the first fifteen minutes of the hour long visits smoking cigarettes in an adjacent room. At times, she failed to appear as scheduled explaining later she just "didn't want to visit." She missed the first parenting class which she agreed to attend acknowledging she was "on crack" that day.
On occasions during this two year period, the mother's whereabouts were unknown by the State; and, when she decided to reappear, her efforts to reform were minimal at best. As mentioned, just prior to the termination hearing, she attempted to find housing; but even this effort was contingent on her gaining custody of the children and only provisional in duration. Also, she has not "bonded" well with the children; and, her willingness to devote greater efforts to bond with the premature child was not foreseeably forthcoming. She continued to refer to this child as "that little girl" and expressed to Dr. Brennan, a clinical psychologist, her real interest was in obtaining custody of the boys and not the girl.
Dr. Brennan testified the mother exemplified difficulty in maintaining motivation; and, she required immediate gratification. She stated the mother displayed long term personality problems which she described as an "anti-social disorder" resulting in a low tolerance level and failure to conform to social restraints. She suggested the mother's recent attempts to reform by locating housing resulted from "ulterior motives" rather than a genuine effort to care and provide permanent shelter for the children. Ultimately, in Dr. Brennan's opinion, her "prognosis was very, very poor," and permanent change in her behavior was "unlikely."
The caseworkers and Dr. Brennan, all agreed, the best interest of the children would be served by allowing them to remain in the care of the foster parents with whom they are psychologically bonded; and permanently terminating the mother's parental contact with the children. SL's foster parents also expressed a desire to adopt her in the future.
Regarding the father's ability to care for SL, Dr. Brennan stated if he or his mother could provide a stable and caring environment for the child, her adjustment should follow without much difficulty. The record discloses the State's effort to reunite the family was principally devoted to returning the children to the mother. Except for addressing letters to SL's father, and conversing with him by telephone prompted by his initial contact, the State did not attempt to locate him by visiting his last known address or discovering his whereabouts during the periods of his incarceration. We are unable to determine from the record, the dates and length of the father's incarceration after the birth of SL. It is certain, however, at the time of her birth he was incarcerated; and, at the time of the termination hearing he was *1191 again incarcerated. His anticipated release date was in March, 1993, less than two months after the termination hearing. On release, the father testified he was promised employment by a cement contractor as a finishing helper. By the mother's accounts, he had been supportive of her in the past; and, he had developed a good relationship with the boys who were not his children. Explaining his failure to provide monetary support for SL after birth, the father stated the reasons for this failure was because the mother did not request assistance. The father's mother testified she would take care of SL while her son worked. She related, at the time of the hearing, she was caring for five grandchildren; and, one more, would not over burden her. Even SL's foster parents expressed a willingness to allow the father visitation and to await his attempt to establish a relationship with the child.

LEGAL PRECEPTS
Parental rights to the care, custody and management of children is a "fundamental liberty interest warranting great deference and [vigilant] protection under the law. State in the interest of J, 582 So.2d 269 (La.App. 1st Cir.1991); State in the Interest of Three Minor Children, 558 So.2d 1238 (La.App. 1st Cir.1990). Thus, this State's legislature has imposed statutorily strict procedural and evidentiary requirements which must be met before issuance of a judgment terminating parental rights. As explained in State in the Interest of J, the evidentiary standard established in termination cases mandates, in part for public policy reasons, that the State present proof by clear and convincing evidence of the parents' failure to comply with all the enumerated conditions specified in each paragraph of La. Children's Code Article 1015 which permits termination of parental rights under certain circumstances. This heightened burden of proof requires the State to show not only the existence of the fact sought to be established is "more probable;" but rather the fact is highly probable or more certain. Hines v. Williams, 567 So.2d 1139 (La.App. 2d Cir.), writ denied, 571 So.2d 653 (La.1990). It is often difficult for appellate courts to examine a record and determine just how much proof exists to establish an alleged fact clearly and convincingly; but one rule is certain. When the fact scale is just about evenly balanced (close, as expressed by the trial judge in this case), it should be tipped in favor of the parent opposing termination. To require less would undermine, substantially, the protection granted parents which are designed to prevent unwarranted or premature termination of their parental rights. We are mindful, however, in assessing whether the "clear and convincing" evidentiary standard was followed below, we must determine whether the record reflects the trial judge manifestly erred or was clearly wrong. Rosell v. Esco, 549 So.2d 840 (La.1989).
Louisiana Children's Code Article 1015 provides the grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
"(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
* * * * * *
(8) Desertion of the child
(a) The child has been abandoned by his parent for a period of at least four months.
(b) The parent has made no provision for the child's care and support.
(c) After a diligent search, the whereabouts of the child's parent is unknown.
(9) Abandonment of the child
(a) The child has been abandoned by his parent for a period of at least four months.

*1192 (b) The parent has failed to provide for the child's care and support, without just cause, thus demonstrating an intention to permanently avoid parental responsibility."

DISCUSSION
As noted, each of the conditions stated in any one of the subparts must be established by "clear and convincing" evidence. Thus, to terminate the mother's right the State was required to show more than one year elapsed since the children's placement in the custody of the State after court adjudication that they were in need of care; the State made every reasonable effort to reunite the children with the mother without success; she is unfit and no reasonable expectation of reform exists; and the children's best interest would not be served by reunification with the mother.
The children's custody was adjudicated to the State after a finding by the court that they were in need of care by judgment dated December 13, 1990. More than one year elapsed between rendition of this judgment and filing of the termination petition. The record amply demonstrates the State implemented a plan and made every effort to reunite the mother with the children. The caseworkers actively sought to encourage and assist her in obtaining substance abuse counseling; and, they scheduled numerous parenting sessions to aid her in coping with and caring for the needs of the children, including the premature infant. They also scheduled regular visitation for the mother to bond with her children; and, they referred her for psychological evaluation. For two years, the State continued to work with the mother in hope of reuniting her with the children. At six-month intervals, the State reported the mother's progress to the court and recommended continued placement of the children allowing her time to reform and establish a stable home for the children. During the majority of this period, the mother continued to abuse drugs and alcohol; failed to successfully complete recommended treatment programs; failed to regularly attend AA meetings; failed to keep scheduled visits with the children; failed to establish a suitable residence until just before the termination hearing; failed to obtain employment; and failed to "put forth" her best effort to bond with the children, particularly her premature daughter whom she abandoned at birth. Dr. Brennan testified in her opinion the mother was unfit to care for the children; and, her mental and emotional problems suggested a strong likelihood that she would not reform in the future. As the doctor explained, her history revealed she tended to establish only "superficial" relationships with individuals; and, her ability to accept responsibility even for her own conduct was below the norm. Both the doctor and social workers questioned her motive for attempting at the "eleventh hour" to find a home for the children and increasing her visits with them. The mother freely admitted during the hearing the residence she secured was located in a drug infested area; and, she did not believe it was suitable for permanent placement of the children. The mother also discontinued all efforts to secure drug counseling or to attend AA meetings despite the advice of the social workers, Dr. Brennan, and numerous substance abuse counselors. Her only means of support was derived from the financial gratuities of male companions.
Although compassion militates in favor of the mother's plea for yet another chance just as in the movie "Lies and Lullabies," the sequel to real life ultimately required the court not only to protect her parental rights but to protect the children's rights to thrive and survive. The record, when reviewed in whole, supports the trial judge's decision to terminate the mother's parental rights; and, convinces us that the mother's attempts to reform have not been genuine nor long lasting. The future does not hold promise that she will substantially modify her behavior.
The sequel to the father's story, however, has not been aired. To establish desertion the State was required to show by clear and convincing evidence he abandoned SL for a period of at least four months; he made no provisions for her care and support; and his whereabouts were unknown. The State does not deny it was aware of the father's last known address where he continuously resided except for the periods of his incarceration. *1193 During the latter periods, the State did not attempt to communicate with the father by contacting him at the local parish jail. When he appeared at the Office of Community Services, it was by his own initiative and desire to visit with the child. The caseworkers admitted on this occasion, he was not given any instruction to contact the agency or assigned regular visits with the child. The reasons expressed for this failure were attributed to the mother's statement that she did not want the child residing with the father or his mother. When the father's mother visited the child and expressed interest in caring for her, the caseworkers again did not provide her with a visitation schedule or otherwise discuss the child's future placement. The trial judge clearly erred in finding the State satisfied its burden of proof in establishing each condition enumerated in paragraph (8), subsections (a) through (c).
Further, to prove the father abandoned the child, as provided in paragraph (9), subsections (a) and (b), the State was required to show he abandoned the child for a period of at least four months and he failed to provide for her care and support without just cause. Again, the State failed to clearly and convincingly establish each of these conditions. The father testified at the time of the child's birth, he was in jail. The date of his subsequent release is not reflected in the record. Without receiving any notice from the State, the father visited the child in May, 1991 and conversed with the agency on June 1, 1991. Although two letters dated in August, 1991 and April, 1992 purports to bear the father's signature and acknowledgement of receipt, the record does not show when his probation was revoked and the date he was again incarcerated. Examination of the record strongly suggests, at some point during this period, the father's probation was revoked and he was incarcerated. We cannot find legally, during the periods of incarceration, the father voluntarily abandoned the child; or failed to provide support without just cause. Even when released, the State failed to present evidence showing he failed to support the child without just cause. The child was in the custody of the State; and, as the father explained, he was not instructed to forward any payments to the State or requested by the mother to provide financial support for the child. His mother offered to care for the child in her home; and, the father voluntarily contacted the State and visited the child, thereby, overtly showing his concern. It was the State's burden to prove he failed to support the child "without just cause." This it failed to do. The record does not reveal whether the father was employed continuously during the periods he was released from jail. Although the State urges permanent placement of the child with the foster parents is in her best interest, this fact alone is insufficient to terminate the father's parental rights.
Moreover, federal guidelines set forth in the Adoption Assistance and Child Welfare Act, require this State to make every reasonable effort to reunite the child with both natural parents. The State admitted it did not notify the father of the scheduled adjudication hearing; and, it failed to initiate any contact with him until after his visit with the child in May, 1991. The father was not named in the child's birth record; but, his identity was revealed to the State. Only after failing in its effort to reunite the children with the mother did the State attempt to contact the father by formal notice through written correspondence beginning in August, 1991. It did not make any effort to contact the father during his subsequent incarceration; and, it proceeded to seek termination of his parental rights without developing any plans to reunite him with the child by offering counseling, team conferences, parenting sessions, or scheduling child visitation prior to his incarceration or after his anticipated release in March, 1993. Instead, the State now urges the entire onus was placed on the father to contact it. We disagree. The father was not required to disprove the State's allegations. The burden, at all times, rested with the State to prove by substantial evidence each ground statutorily specified for termination of parental rights. Accordingly, we must reverse that portion of the trial court's judgment terminating his parental rights and remand the case for further proceedings with specific instructions to the State to make every reasonable effort to afford the father opportunity to demonstrate *1194 his stability and capability of caring for the child.
For the foregoing reasons, that portion of the judgment terminating the parental rights of the mother is affirmed. However, we reverse that portion of the judgment which terminates the father's parental rights; but custody of SL will remain with the State. The State is ordered to proceed in a manner consistent with the instruction given above; and, in accordance with applicable law. On remand, the lower court is directed to fix reasonable attorney's fees for the curators ad hoc in accordance with La. Children Code Article 1013(B).
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
LABORDE, J., concurs in the result.