649 So.2d 1183 (1995)
In the Interest of L, J, A, A, C, And C, Plaintiffs-Appellees
v.
A.S., B.S., And K.S. Defendants-Appellants.
No. 94-1316.
Court of Appeal of Louisiana, Third Circuit.
February 1, 1995.
*1184 Leah Antoinette Beard, Michelle Meaux, for Leslie Lynn Suire et al.
Alfred Frem Boustany, II, for Antoine Suire Jr., et al.
Diane Sorola, Asst. Dist. Atty., for State of Louisiana.
Carl James Castille, for Keith Spears.
Sharon Courville, Guy Sylvester, Raelynn Conque, for Office of Community Services.
Before LABORDE, YELVERTON and COOKS, JJ.
YELVERTON, Judge.
This is an appeal from a judgment terminating A.S.'s and B.S.'s parental rights over their six children. Each parent brought one child into the marriage and they had four together.
The State of Louisiana through the Department of Social Services (DSS) first became involved in this matter in January 1988 upon receiving a complaint about lack of adequate supervision concerning the oldest daughter who walked to school in the pouring rain. At that time the DSS spoke with the parents concerning the allegations and the importance of maintaining and providing a safe, healthy environment for the children.
The DSS became involved again with this family following a complaint with respect to the oldest daughter for medical neglect. This was in September 1989. She had been diagnosed with an ear infection and did not receive medical attention for a month and a half until the DSS became involved.
In January of 1990 the DSS received another complaint regarding inadequate shelter for this family. The house was without lights, water or gas. The DSS helped the family in reconnecting their utilities by obtaining funds through the preventive assistance fund program.
Finally, the DSS received a fourth complaint in May 1990 regarding the parents' failure to provide adequate shelter, proper medical care, and proper hygiene for the children. At this point, the DSS requested court ordered supervision and that the children be adjudicated in need of care.
In July 1990 the family services unit of the DSS became involved in the case to offer services to the family to try to remedy the problems in the home. They assisted in getting trash pickup with Environmental Services because the parents could not afford to bring the trash to the dump. Before that, the trash had been thrown in the yard or under the trailer where they lived. The DSS tried to help the parents obtain a medical card for the oldest daughter because the parents would not take her to the hospital because of the long wait. The DSS also offered parenting classes which were taken by the mother. Cleaning supplies were also furnished.
The DSS continuously received calls about the condition of the two children in school. There were complaints of torn, dirty and improperly fitting clothing. There were complaints of bad hygiene. There were numerous complaints about the body odor of the family. The DSS also discovered that the children did not have toothbrushes. One of the children was not getting care for her asthma problem. The children also were not supervised when they played outside the house which was located on a busy highway. *1185 The yard was filled with a large amount of scrap metal which could injure them.
Witnesses described the dwelling where the family lived. It was in a deplorable state. It was not fit to live in. There were piles of clothes all over the floor. Windows were cracked. The home had a pervasive urine-type odor. It was infested with rodents and insects. Animal and human feces were scattered about the place. Spoiled and rotten food was in the kitchen and cabinet areas. Photographs introduced into evidence vividly verify some of these descriptions.
The parents were cooperative but did not see a problem with their lifestyle. On announced visits the home would still have clothes and trash everywhere. It was also observed on these visits that the wife was the one who took care of the six children without any help from the husband. The oldest daughter who was eight-years-old also had a lot of responsibility for cleaning the house and taking care of the younger children. On one visit the father pulled out a gun and started waving it at the family service worker.
Finally, on December 23, 1991, the children were removed from the home after an instanter order was obtained from the commissioner. By order of the district court all six children were placed in the temporary custody of the DSS. On December 27 the DSS was granted custody of the six children. The children were adjudicated children in need of care on February 25, 1992 and a judgment of disposition was entered. Several review hearings were held from July 1992 to November 1993.
Over four years after the DSS first became involved with this family, after futile attempts to remedy the problems in the home in order to keep the family together, a petition for termination of parental rights was finally filed, pursuant to La.Ch.Code art. 1015, on March 25, 1994. After a hearing on August 4 and 5, 1994, the trial court on August 17 entered a judgment terminating the parental rights of A.S. and B.S. over their six children. The parental rights of K.S., the alleged possible father of one of the children, was also terminated.

TERMINATION OF PARENTAL RIGHTS
A.S. and B.S. have appealed the judgment terminating their parental rights. They claim the evidence was not sufficient to support a termination.
The DSS based its petition for termination of parental rights on La.Ch.Code art. 1015(4) and (5) which read as follows:
(4) Prior adjudications as a child in need of care
(a) One year has elapsed since a child in need of care adjudication.
(b) The parent is unfit to retain parental control.
(c) The parent has shown no significant, substantial indication of reformation, and there is no reasonable expectation of his reformation in the foreseeable future.
(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
The termination of parental rights is a severe and terminal action and to permit it the State must satisfy an onerous burden of proof. Before parental rights can be terminated, the State must prove, by no less than clear and convincing evidence, that all elements of at least one subsection of the statute have been met. State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993).
Raelyn Conque, the family service worker who worked with the family before the children were removed, found that the condition of the house was hazardous and injurious to the children's health and well-being. The children and house were always filthy. She *1186 tried to get the parents to improve things around the home and improve their lifestyle, but found they were not open to changes because they felt everything was adequate. The parents did make some minor changes for a few months but soon reverted to their old ways of living in unsanitary conditions. She saw the children after they were placed in foster homes and noticed that then they were always clean. Conque was of the opinion that the mother was overwhelmed with all the children and having to clean the house with no help from the father.
Sharon Courville, a case manager with the Lafayette Parish Office of Community Services, worked with the parents after the children were removed toward a permanent plan for the children. She witnessed that the parents were not able to control the children even after attending parenting classes and counseling. The parents had another child born after the six children were removed. Before the baby was born, a worker had been sent to the home to assist the parents in developing some parenting and cleaning skills. There were no significant changes in their lifestyle once the worker left although there had been changes when the worker was present. After the baby was born, another worker was sent in for 20 hours a week to help them develop a routine. There were improvements in the home but once the worker left the parents went back to their old ways.
At this time the mother was placed in Project Independence. This program allows a person to receive public assistance to get an education towards getting a job. She would attend school in the mornings and then work at the food stamp office in the afternoons with her husband. However, she quit Project Independence because it was too much for her and was "getting on her nerves". They also quit their afternoon job at the food stamp office because they did not want to ride the city bus even though the DSS had given them bus passes. In addition, the father would not apply for unemployment benefits after he lost his job because he did not want to go through the hassle.
Extended visits with the children and parents were also implemented. However, they could not control that many children. On one occasion one of the boys, who was five-years-old at the time, slipped out to a nearby convenience store on a busy highway and stole an ice cream cone. The father admitted he saw the child doing this but claimed he could not cross the street to get him because he had groceries in his hand and another child with him. He was not concerned that the five-year-old might run into the street and get injured. The mother claimed she was cleaning and did not notice the child had left the home.
Several children were also sexually molested by a relative of the mother who was living with the family. The mother even admitted that she let this relative come back into the house after she knew he had sexually molested the children.
Dr. Ed Bergeron, a psychologist, provided evaluations of the parents. He also provided therapy to the four oldest children. Dr. Bergeron opined that the potential for both parents to change their ways was poor. He explained that interventions had been implemented with no appreciable gain in their parenting skills. The psychological testing substantiated that their pattern of behavior was chronic and ingrained and resistant to change. He also noticed that the children had been improving in foster care, but that after visitations with their parents they would become very aggressive and very destructive. He was of the opinion that it was not in the best interest of the children to return them to live with their parents.
One foster parent who was keeping the boys indicated that she had to teach them how to bathe and brush their teeth. They were difficult to control when they came to live with her and were still difficult to control although their behavior had improved somewhat.
All the people involved in this case indicated that the parents were cooperative in allowing them into their home to teach them new skills. The parents just refused to implement these new skills. It was hard for them to control their six children and keep a clean house. As long as someone was helping *1187 them, the house would be in order. At the time of the hearing they only had one child to care for. The workers expressed concern that conditions would deteriorate rapidly with the return of the six children since they were not even able to keep up their house with only one child. The parents themselves did not want two of the boys back, claiming they were hard to control. The mother admitted that seven children would get on her nerves but stated that the older children would be in school and she would put the others in day care so she would only have to take care of them at night.
This is not a case of physical abuse by the parents. It is a case in which the parents have failed to properly care for the children and even after several years of instruction and help from the DSS, there was not much improvement. The parents have cooperated but fail to see the importance of proper care and supervision of their children. The environment in which the children lived was one of extreme neglect. The children's health and well being were in danger. The conditions in the home since the children have been taken out have not improved that much. Even with all the assistance they have received from the DSS, the parents show no indication of reforming their behavior. We can only imagine what would happen if the children were returned. We find that the State proved by clear and convincing evidence that it is in the best interest of these six children that A.S.'s and B.S.'s parental rights be terminated pursuant to La. Ch. Code art. 1015.
Accordingly, the judgment below is affirmed. To the extent allowed by law, all costs are assessed to the State.
AFFIRMED.