777 So.2d 508 (2000)
STATE of Louisiana, In The Interest of D.R.B.
No. 00-1321.
Court of Appeal of Louisiana, Third Circuit.
December 6, 2000.
*509 L. Kimberly Jones, Opelousas, LA, Counsel for Defendant/Appellant, C.B.
*510 L. Antoinette Beard, Department of Social Services, State of Louisiana, Lafayette, LA, Counsel for Plaintiff/Appellee, State of Louisiana, Department of Social Services.
Greta Marion, Opelousas, LA, Counsel for Plaintiff/Appellee, D.R.B.
Vanessa Harris-Kennerson, Assistant District Attorney, Opelousas, LA, Counsel for Plaintiff/Appellee, State of Louisiana, District Attorney's Office.
Connie Guillory, Ronald Pitre, Case Managers, Opelousas, LA, State of Louisiana, Office of Community Services, St. Landry Parish.
C.B., Sunset, LA, pro se.
(Court composed of Judge ULYSSES GENE THIBODEAUX, Judge OSWALD A. DECUIR and Judge JIMMIE C. PETERS).
THIBODEAUX, Judge.
C.B. appeals the trial court's termination of her parental rights regarding her minor child pursuant to La.Ch.Code art. 1015. The trial court terminated her rights after finding that she is incapable of parenting and that her reformation is unlikely. We find that the record supports the termination of her parental rights and affirm the trial court's judgment.

I.

ISSUES
The sole issue presented for our review is whether the trial court erred when it terminated C.B.'s rights as the child's parent under La.Ch.Code art. 1015(5).

II.

FACTS
C.B. is the mother of D.R.B. D.R.B. was born on May 7, 1998. C.B. has a long history of psychiatric problems. She has been diagnosed as suffering from schizo-affective disorder. She is delusional and experiences auditory hallucinations. Her diagnosis also includes borderline intellectual functioning. She has been hospitalized for her mental illness, both voluntarily and involuntarily, numerous times. During the eighteen months prior to the termination proceeding that is the subject of this appeal, she was hospitalized eleven times. Her condition is not curable and she will have to take various medications for the rest of her life.
On July 13, 1998, when D.R.B. was two months old, C.B. admitted herself into Charter/Cypress Mental Health Hospital of Lafayette because she realized that her medications were not having their desired effects and she felt that the dosage needed to be corrected. C.B. felt that she was unable to care for D.R.B. for the time being. Because she had no family members to care for him in the interim, she consented to his being placed in the custody of the Louisiana Department of Social Services (hereinafter "DSS") for what she thought was to be a very short period. She expected to be reunited with her son upon her discharge. Unfortunately for C.B., this did not occur. On August 27, 1998 the court deemed D.R.B. to be a "Child In Need of Care." On February 25, 1999 the court approved a case plan for the safe return of D.R.B. to his mother and ordered him to remain in foster care until further order by the Court. D.R.B. has been in the care of a foster couple, E.H. and J.H., since July 15, 1998. He was placed with them by the court two days after he went into the custody of DSS. D.R.B. has remained with this foster couple since that time.
E.H. and J.H. are now planning to move out of state due to a job change and they are seeking to adopt D.R.B. On September 21, 1999, W.J.T., D.R.B.'s biological father, signed a Voluntary Act of Surrender for Adoption by an Unmarried Father. On April 11, 2000, the Department filed a "Petition for Termination of Parental Rights of C.B. and Certification for Adoption." The DSS alleged four grounds to support the termination of C.B.'s parental rights. These were as follows: (1) C.B.'s *511 non-compliance with the treatment and rehabilitation program in her case plan; (2) her lack of substantial improvement in addressing her problems; (3) the conditions leading to the removal of D.R.B. from her custody persist; and (4) C.B. has a mental illness and mental deficiency that render her unable/incapable of exercising parental responsibility. The trial on the merits was on June 26, 2000. The DSS ordered that C.B.'s parental rights be permanently and irrevocably terminated.

III.

LAW AND DISCUSSION

Standard of Review
Whether a termination of parental rights is warranted is a question of fact. State in the Interest of K.N.F., 96-390 (La.App. 3 Cir. 7/17/96); 677 So.2d 166. A trial court's factual determinations, including whether a parent is unfit and whether there is a reasonable expectation of reformation, will not be set aside in the absence of manifest error. State in the Interest of Q.P., 94-609 (La.App. 3 Cir. 11/2/94); 649 So.2d 512. An appellate court's standard of review of a judgment terminating parental rights is whether or not the record reflects that the trial judge was clearly wrong. State in the Interest of J.L., D.L., and S.L., 93-352 (La.App. 3 Cir. 5/18/94); 636 So.2d 1186, overruled on other grounds, Louisiana in the Interest of M.L. and P.L., 95-0045 (La.9/5/95); 660 So.2d 830.

Burden of Proof
The law is well-established that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in the Interest of A.C., 93-1125 (La.1/27/94); 643 So.2d 719; cert. denied, A.St.P.C. v. B.C., 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995). The parent's constitutionally protected liberty interest includes her right to the companionship, custody and management of her children. State in the Interest of A.C., 643 So.2d 719. Louisiana jurisprudence has long recognized that the biological parents' rights to their children and the children's reciprocal rights are preeminent among relationships in the human family. See In re Adoption of B.G.S., 556 So.2d 545 (La.1990). However, more than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Interest of S.M., et al., 98-0922 (La.10/20/98); 719 So.2d 445, on remand, 99-0526 (La.App. 4 Cir. 4/28/99); 733 So.2d 159, writ denied, State ex rel. S.M., 99-2127 (La.7/21/99), 747 So.2d 36. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. Id. The child has a profound interest in being in a home where she will receive proper parental care. Lehman v. Lycoming County Children's Serv.'s Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also State in the Interest of S.M., 719 So.2d 445. These interests may be at odds with the interests of the parents in the case where the involuntary termination of parental rights is sought.
Recognizing that the termination of parental rights is a serious and terminal action, the legislature has mandated that in order to terminate these rights, the State must satisfy an onerous burden of proof. In the Interest of L. v. A.S., 94-1316 (La.App. 3 Cir. 2/1/95); 649 So.2d 1183. Namely, the State bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La.Ch.Code art. 1035(A); State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993). Pursuant to this standard, the State must show that the parent's failure to comply with the enumerated condition is highly probable. State in the Interest of Q.P., 94-609 (La. App. 3 Cir. 11/2/94); 649 So.2d 512. When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven under the evidentiary standards *512 required by Article 1035, and that it is in the best interest of the child to terminate, it shall order the termination of the parental rights of the parent against whom the allegations are proven. La.Ch.Code art. 1037.

Grounds For Involuntary Termination of Parental Rights
C.B. assigns as error the trial judge's finding that termination of her rights was in the best interest of D.R.B. Although the best interest of the child is a consideration in such a proceeding, it cannot serve as the ground for involuntary termination. The best interest of the child is a consideration only after the grounds for termination have been proved under one of the enumerated grounds of Louisiana Children's Code Article 1015. See La. Ch.Code art. 1037. Here, DSS has sought termination under Louisiana Children's Code Article 1015(5) which provides that parental rights may be terminated if the following grounds are proven:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
La.Ch.Code art. 1015(5).
Thus, for termination under this subsection, DSS must prove all of the following elements: (1) that D.R.B. has been in the custody of DSS for at least one year; (2) that C.B. did not substantially comply with the court-approved case plans; and (3) that C.B.'s improvement in the near future is unlikely. Although DSS need only prove that the grounds for termination exist under one subsection of Article 1015, all elements of that subsection must be met. The minimum standard of proof in termination of parental rights cases is clear and convincing evidence. La.Ch. Code art. 1035(A); see also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

Duration of DSS Custody
D.R.B. was first placed in the temporary custody of DSS on July 13, 1998. The court adjudicated D.R.B. a child in need of care on August 27, 1998. He is still in custody of DSS at the present time. The petition for termination of parental rights was filed on April 11, 2000, more than 20 months later. Therefore, the statutory requirement of one year is satisfied.

Substantial Compliance with Case Plan
DSS caseworkers developed a case plan for C.B. to facilitate her reunification with her son, as required by law. The case plan developed by the Lafayette Parish Office of Community Services in 1998 required her to do the following: (1) maintain her housing and utilities; (2) maintain a financial budget and show proof of her budgeting methods; (3) maintain a relationship with D.R.B.; (4) maintain her medication; (5) attend Family Team Conferences; and (6) attend and participate in court hearings.
There was no evidence presented to the court at the trial that C.B. did not comply with the above requirements of her case plan. Ms. Guillory, a foster care worker for the Department, stated that C.B. had maintained her housing, kept food in the house, and kept all her scheduled visitations with her son. She did, however, receive significant assistance from social workers. She regularly takes her medicine. In fact, she immediately seeks medical attention when she is aware that the medication is not helping her condition as it should be. C.B. wants very much to be reunited with her son and seems to have made every effort to comply in order to be *513 reunited with him. Mr. Ronald Pitre of the Office of Community Services Foster Care Division did state that C.B. was still having some trouble with money management due to some checks she had written. This was the only area of non-compliance of which he was aware.
Further, there is no evidence that D.R.B. would be in danger in his mother's care. C.B. has never abused him. Nor has she ever shown any violent tendencies toward anyone else. DSS social workers have speculated that if C.B. were not to take her medicine, she would perhaps forget to care for him or feed him. Speculations, however, are not grounds for termination of parental rights. In fact, C.B. showed a great deal of responsibility by voluntarily surrendering her child when she realized her medication was not working properly and needed adjustment. The Crossroads Administrator and psychiatric nurse, Gretchen Kaltenbach, testified that C.B. faithfully took her medication and always notified personnel when it was not working properly.
However, under Louisiana Children's Code Article 1036(C), there are a number of ways in which non-compliance with a case plan can be shown. Reformation requires that a parent demonstrate significant improvement in the conditions that served as the basis for the removal of the children from the home. State in the Interest of Broussard, 94-1613 (La.App. 3 Cir. 5/3/95); 657 So.2d 121. Jurisprudence holds that "[a] parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated." State in Interest of S.M., et al., 98-0922, p. 9 (La.10/20/98); 719 So.2d 445, 450 (quoting State in Interest of J.M., 30,302, p. 7 (La.App. 2 Cir. 10/29/97); 702 So.2d 45, writ denied, 97-2924 (La.2/6/98); 709 So.2d 736).
DSS alleged the following grounds of non-compliance with the case plan: (1) C.B.'s non-compliance with the treatment and rehabilitation program in her case plan; (2) her lack of substantial improvement in addressing her problems; and (3) the conditions leading to the removal of D.R.B. from her custody persist. C.B.'s treatment and rehabilitation plan consisted primarily of continuing her medication therapy. Testimony indicated that she generally complied with her doctor's orders and took her medication. It appears from the record that C.B. wants to rehabilitate herself and has indeed been trying to do so. Unfortunately, the severity of her mental illness makes her rehabilitation very difficult because the medication is not having the desired effects on her condition. D.R.B. was removed from her custody because of conditions which rendered her unable to care for her son. Testimony and documentary evidence show that these conditions have not changed during the year that he has been in foster care and that she remains incapable of parenting her child safely. Dr. Bergeron testified as to her psychiatric condition. He stated that she continues to exhibit severe delusional and psychotic thinking. She continues to suffer from emotional instability and experiences ongoing problems with depression, anxiety, and agitation. He noted that her mild mental retardation, which is not treatable, is also a factor in the severity of her mental illness. Dr. Bergeron testified that during delusional periods, any children in her care would be in danger.
Being separated from her child has no doubt worsened her depression and anxiety. However, the fact remains that she has not been rehabilitated. Therefore, we find that there has been no substantial compliance with the case plan.

Likelihood of Reformation in the Future
DSS also alleged that C.B.'s mental condition prevents her from being able to exercise parental responsibility. Thus, according to DSS, her mental illness and *514 mental deficiency make her highly unlikely to be able to reform in the near future.
The Louisiana Supreme Court has held that a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, even though all of the problems that exist have not been eliminated. State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993). Thus, the likelihood of reformation is based at least in part on the parent's compliance with the case plan.
There seems to be little, if any, hope of C.B. ever being able to care for her child, or even herself, without daily outside help. Although C.B. did maintain her housing during the period in question, this was substantially due to active involvement by social workers. Further, Dr. Bergeron, a licenced psychologist in the field of clinical psychology and family psychology, testified that C.B.'s illness involves many fluctuations and disturbances of thought such as delusions, depressions, and manic behaviors. C.B. will take medication for the remainder of her life for her mental illness. Dr. Bergeron stated that in some individuals this type of illness is controllable through the use of medication. However, he stated that C.B.'s condition appeared to be non-responsive to medication. He found that everything that could be done to improve her condition was being done; however, she continued to experience serious delusional episodes and demonstrated psychotic behavior. He admitted that although she would have periods where she could probably function somewhere within the normal range, her illness would not be consistently predictable or controllable even with medication. He stated that this was partly due to the severity of her mental illness and partly due to her borderline mental retardation for, generally, the lower the intellectual ability of a mentally ill person, the less favorable the prognosis.
Gretchen Kaltenbach, a registered psychiatric nurse and the Crossroads administrator, has known C.B. since 1997. She testified that unsupervised, without any structure or supervision, C.B. would not be able to adequately care for herself, let alone handle her child. She testified that C.B. had stayed in many homeless shelters and, in fact, was residing in a homeless shelter one month prior to D.R.B.'s birth. She was in favor of D.R.B. remaining in foster care because she did not feel that C.B. would be able to adequately care for him on her own.
However, Ms. Kaltenbach was opposed to the termination and adoption if it would mean removing D.R.B. from the state of Louisiana because C.B. would never again be able to see him and she feared this would have a detrimental effect on C.B. She noted that over the past year C.B.'s behavior and condition actually seemed to improve because of her great love of her son and her desire to regain custody of him. We recognize the sincerity of her testimony on C.B.'s behalf that C.B. would "give her right arm to be a mother and have a job." But Ms. Kaltenbach also admitted that C.B. would probably never be able to do those things without daily assistance. All of the evidence indicates that C.B. would never be able to function independently as D.R.B.'s mother.
By no means are we saying that mentally ill people cannot be parents. A finding of mental illness alone is not grounds to remove a child from a parent's care. State in the Interest of J.A., 99-2905 (La.1/12/00); 752 So.2d 806. It would be a serious injustice as well as a violation of the due process rights of the mentally disabled if they were to be deprived of their children merely because of their disability. However, if that mental illness is so severe that it renders the parent unable to care for his or her child, then there may be grounds for removal. In a case where the mother suffered from chronic schizophrenia which the supreme court found rendered her incapable of caring for her child, the court held that:

*515 [T]he mental deficiency must be related to the parenting ability. That is, if the evidence provides clear and convincing evidence that the prognosis for [the parent's] recovery in the near future is poor and there is no reasonable expectation of significant improvement in her condition in the near future, then termination is proper if it is in the best interests of the child and the additional grounds for termination have been met.
State in the Interest of J.A., p. 15, 752 So.2d at 814.
C.B.'s mental illness is significantly related to her parenting ability. Because of her illness, she was homeless prior to the involvement of DSS. She has never held a job. All of her appointments with social workers and medical personnel are made for her. DSS arranges for her transportation to all appointments and court appearances. She needs assistance for budgeting and personal decision-making. She will continue to need daily outside assistance in order to care for herself. Further, according to Dr. Bergeron, she is irresponsible and unreliable. She has long periods of psychosis and poor reality contact. He testified that in periods of stress she is prone to a full psychotic break. During a psychotic break, a child in her care would be very vulnerable to neglect or abuse.
C.B.'s mental illness is, therefore, related to her parenting ability and there is little, if any, hope for significant improvement in her condition. Thus, we find that there is very little likelihood of her reformation in the near future.

Best Interest of the Child
The best situation for C.B. would be if D.R.B. could remain in foster care with E.H. and J.H. and maintain a relationship with his mother, seeing her on a weekly, bi-weekly or even monthly basis. Regular visitation with D.R.B. would give C.B. the incentive to continue to strive to be as self-sufficient and responsible as she is capable of being, as well as encourage her to remain on her medication. But her well-being is not the standard by which we must decide whether to terminate her parental rights. Where the grounds for termination have already been met, as they have here, we must consider whether termination is in the best interest of the child, D.R.B. Thus, the interests of the parent must give way to the interests of the child.
Further, federal guidelines, as set forth in the Adoption Assistance and Child Welfare Act of 1980, which require that the states make reasonable efforts at reunification of the parent and child, also require the State to develop an alternative permanency plan when, as here, there is no reasonable probability of reunification. See 42 U.S.C.A. § 671 (1999). Foster care is not considered permanent placement. According to the Louisiana Children's Code, "permanent placement" means one of the following: (1) the return of the legal custody of a child to his parent(s); (2) the placement of the child with adoptive parents pursuant to a final decree of adoption; or (3) the placement of the child with a legal guardian. La.Ch.Code art. 603(15).
The intent of the AACWA was to combat the foster care limbo to which so many of the nation's abused and neglected children were being subjected. Alice C. Shotton, Making Reasonable Efforts in Child Abuse and Neglect Cases: Ten Years Later, 26 CAL. W.L.REV. 223, 253 (1989-1990). Children who remain in the foster care system, bounced from one foster home to another, generally lack a parental figure, financial security, and guidance. They are never given the opportunity to develop strong ties to a family and they may never know emotional security. Moreover, when they reach 18, if they have not finished school and already found a vocation, they may find themselves no longer eligible for any state support, other than welfare, and lack a family support system to fall back on.
D.R.B. has been with E.H. and J.H. since the age of two months. He is now *516 two years and seven months old. They are the only family he has ever known. According to testimony, he has bonded with them and they with him. He is fortunate to have found a stable, loving family who wishes to adopt him. Unfortunately, E.H. and J.H. are moving out of state. If termination were now denied, D.R.B. would be uprooted from this home and placed into another foster home. He would then very likely face a childhood of being transferred from one foster home to another. Adoption by this family is the only guarantee of permanent placement for him and is his chance for a positive future.

Reasonable Efforts Towards Reunification
"The state has an obligation to make `reasonable efforts' to preserve and to reunify a family, to prevent or eliminate the need for removal of the child to foster care and to make it possible for a removed child to return home." Judge Ernestine Steward Gray, The Adoption and Safe Families Act of 1997: Confronting an American Tragedy, 46 LA.B.J. 477, 479 (1999). Moreover, federal guidelines set forth in the AACWA require this State to make every reasonable effort to reunite the child with his natural parents. State in the Interest of J.L., D.L., and S.L., 636 So.2d 1186.
As we noted above, C.B. was able to meet the specifications of the case plan with the assistance of caseworkers. DSS tried to teach her how to manage her finances, made certain she visited D.R.B., helped her maintain her housing, helped her keep food in the house, and made certain she received the proper medication. Unfortunately, her inability to rehabilitate and significantly alter the conditions which led to D.R.B.'s removal is beyond anyone's control. Therefore, we find that the DSS has satisfied the requirement of reasonable efforts.
After a thorough review of the record before us, we cannot say the trial court was manifestly erroneous or clearly wrong in its determination that the allegations of DSS' petition, setting forth the grounds for involuntary termination of parental rights enumerated in Louisiana Children's Code Article 1015(5), were proven by clear and convincing evidence. Therefore, the trial court properly terminated C.B.'s parental rights as to D.R.B.

IV.

CONCLUSION
For the foregoing reasons, the judgment of the trial court terminating the parental rights of C.B. in relation to D.R.B is affirmed. D.R.B. is now eligible and available for adoption by E.H. and J.H.. To the extent allowed by law, all costs are assessed to the State, Department of Social Services.
AFFIRMED.