J^MOORE, J.
Mr. and Ms. M appeal a judgment terminating their parental rights as to Ms. M’s four daughters. For the reasons expressed, we affirm.

Factual and Procedural Background

In April 2001, the Office of Community Services (“OCS”) in DeSoto Parish received a report of neglect involving Ms. M’s three girls, LBW (age three), LOM (age two) and LFM (age nine months). Mr. M is the biological father of LFM and the legal father of LOM. Paternity of the oldest girl, LBW, is not known.
According to the OCS affidavit, dated April 11, the family was living in a house on Hwy. 789 near Keatchie which was unsuitable for children: there were naked wires, clutter, holes in the floor, a makeshift door, garbage and dirty dishes piled up; all in all, it looked “as if it were hit by a storm.” Prior to the OCS’s visit, the family goat had come in the house, got in bed and defecated; one of the girls crawled on the bed, sat in the droppings and began eating crackers. The affidavit also stated that in 2000, the OCS had declared this house unacceptable, helped move the family to an apartment in Mansfield, and given financial assistance and counseling; however, the family returned to the Keatchie house in March 2001. The OCS obtained an instanter order removing the three children and filed this petition to have them declared in need of care.
The district court found the children in need of care by judgment of adjudication in June 2001. OCS developed a ease plan that required Mr. and Ms. M to complete parenting classes and anger management, undergo psychological evaluations, follow a visitation schedule, submit to random 12drug screens, keep the home clean and free of hazards, financially support the children, and demonstrate knowledge of parenting. They attended the classes between November 2001 and February 2002; both “passed” the oral exams. Both maintained the visitation schedule. Dr. Lonow- *314 ski, a clinical psychologist, found Mr. M to be mildly mentally retarded and essentially illiterate; he disclosed to the doctor a history of being physically abused by his mother. Ms. M also disclosed severe mistreatment as a child, yet she was not as mentally deficient as her husband. Still, she had paranoid sensitivity, limited ability to accept feedback, and rigid views of parenting. Dr. Lonowski thought both parents might benefit from counseling.
Ms. M gave birth to her fourth daughter, CCM, in September 2001.
On the strength of Mr. and Ms. M’s compliance with the case plan, OCS returned the three older girls on April 15, 2002. Betty Morton, the OCS case manager, visited about three times a week to keep tabs on .the children, noticing that as time went on the house was less clean and Ms. M seemed “increasingly overwhelmed.” Nicole Spring, an RN for National Home Care Service, visited the house almost every day to check on LFM, the third child, who was under observation for failure to thrive. She took a dimmer view of the situation: the girls were almost always dirty, dressed in adult T-shirts, and acting inappropriately for them ages. In particular, the girls were always barefoot, their feet caked with dirt. Over Ms. M’s strong objection, Nurse Spring bathed the children. Both Ms. Morton and Nurse Spring testified that they seldom saw Mr. M at the house; part of Ms. M’s problem was that he never helped out.
lain addition to OCS and National Home Care, a Volunteers of America (“VOA”) case worker spent four to eight hours a week at the house, rendering what it .considered to be “maximum service.” Both case workers had left VOA by the time of trial, so their supervisor, Karen Rice, gave a summary of their reports.
When the VOA case worker left on the afternoon of May 30, 2002, all four girls appeared fine. However, when Nurse Spring arrived the next morning, she found LFM covered with bruises. Ms. M tried to explain the girls had been tussling and scratching each other, but Nurse Spring thought the bruising was too severe to have been caused by other children. Mrs. Morton agreed and they carried LFM to the hospital. Dr. Lifshutz examined her and confirmed the injuries were too extensive to be accidental. Nurse Spring testified that someone must have pinched LFM’s nose very hard, probably in an effort to make her eat. Ms. M then admitted to Mary Bagley, an investigator, that she had left the children with Mr. M’s mother-something that was expressly forbidden because that woman had seriously abused Mr. M as a child.
Because of LFM’s injuries, Ms. M’s refusal to keep the children away from Mr. M’s mother, and the deteriorating condition of the house, Mrs, Morton removed all four girls from Mr. and Ms. M on May 31, 2002. OCS filed a petition to have CCM, the youngest child, declared in need of care in June 2002; judgment to that effect was rendered on October 3, .2002.
Dr. Lonowski, the psychologist, conducted further examinations of the parents. Mr. M’s condition had deteriorated in the preceding months; he |4was less oriented and had memory problems; he honestly thought Mrs. Morton had instructed him to leave the girls with his mother, when in fact the opposite was true. Ms. M, though not as depressed as before, was narcissistic and engaged in “simplistic denial”: she simply denied the OCS’s findings. Dr. Lonowski felt .that further intervention would not help her.
At the next case review and permanency hearing, in November 2002, the court again found the three older girls in need of care. However, OCS sent LBW, the old *315 est girl, for psychological evaluations. In January 2003, LBW told family counselor Lisa Chilvers that Ms. M had held LFM’s head underwater in the bathtub. LBW also related that Ms. M had come into her bedroom, put her hands in LBW’s panties, and “played with me a long time.” LBW graphically acted out the episode, convincing Ms. Chilvers that sexual abuse had occurred. LBW also said she had seen her mother lying on the floor and putting something up her vagina, as Mr. M looked on.
At some point, Ms. M admitted to Mrs. Morton that Mr. M “would go out and find other men for her.” Ms. M disputed this, however, testifying that on one occasion, Mr. M brought his nephew over and she had sex with him. She nevertheless admitted that LBW’s father might be Mr. M’s younger brother, and that LOM’s father might be her own stepfather.
At the April 2003 case review, OCS announced that the goal was now adoption, and that the girls had been placed with a foster family in Caddo Parish. In August, it filed a petition to terminate parental rights with respect to all four children. It alleged that termination was warranted under La. Ch. C. art. 1015(5).
| BThe case was tried in November 2003; the witnesses testified as noted above. Ms. M’s sister and Mr. M’s brother testified that when they visited the house, they never saw any inappropriate behavior toward the children.
Ms. M testified that she attended all the required classes, wants her girls back and thinks she can handle them. She agreed to cooperate with OCS, but was “not liking it.” She had no idea how LFM got covered with bruises in May 2002. She insisted that the reports of holding LOM’s head underwater and having sex in front of LBW were “fabrications.” She also warned, “People [need to] stay out of my business and not tell me how to raise my children and take care of my kids.”
Mr. M testified that the parenting classes taught him to be more patient with kids.
The district court found that OCS had complied with the Safe Family Act, 42 U.S.C. § 601, et seq., that there was no evidence of disability discrimination, 42 U.S.C. § 12101, et seq., and that OCS did not act prematurely. The court further found that one year had elapsed from the prior court order removing the children; that Mr. and Ms. M clearly failed to comply with the requirements for reunification, showing no reasonable expectation of improvement; and that both exhibited neglect and abusive behavior. Finding that it would be in their best interest, the court granted the order terminating all parental rights with respect to the four girls.[1]
Mr. and Ms. M have appealed.
| (Applicable Law
Termination of parental rights is governed by Title X of the Children’s Code. As it applies to this case, termination of parental rights is warranted when (1) at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; (2) there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and (3) despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or *316 conduct in the near future, considering the child’s age and his need for a safe, stable and permanent home. La. Ch. C. art. 1015(5).
Lack of parental compliance with a case plan is defined as one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s' repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch. C. art. 1036 C.
Lack of reasonable expectation of significant improvement in the parent’s conduct in the near future may be proved by any of the following:
|7(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
La. Ch. C. art. 1036 D.
The state must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Ch. C. art. 1035 A; Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State in Interest of SMW, 2000-3277 (La.2/21/01), 781 So.2d 1223. To meet this burden, the state need establish only one statutory ground for termination, but the court must also find that termination is in the best interest of the child. La. Ch. C. art. 1037 B; State in Interest of SMW, supra.
The appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re AJF, 2000-0948 (La.6/30/00), 764 So.2d 47. Under this standárd, if there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. State in Interest of SMW, supra; Rosellv. ESCO, 549 So.2d 840 (La.1989).

The Parties’ Contentions

By one assignment of error, Mr. and Ms. M urge the state “failed to prove by clear and convincing evidence that there exists no reasonable ^expectation of reformation in the foreseeable future.” They *317 assert that they completed the parenting classes and that family members never saw any inappropriate conduct in the home. They also cite their own testimony that they learned much from those classes and were doing the best they could with the children. They submit that their cooperation with state officials proves a reasonable expectation of reformation, even though not all problem areas are corrected. State in Interest of SM, 98-0922 (La.10/20/98), 719 So.2d 445. Without elaboration, they urge that the evidence was in equipoise; ergo, the court should rule against termination. In support, they cite State in Interest of JL, 93-352 (La.App. 3 Cir. 5/18/94), 636 So.2d 1186.[2]
OCS concedes that Mr. and Ms. M completed parenting classes; however, despite intense supervision from its own case manager, the VOA and a home health nurse, they totally failed to protect LFM, who got covered with bruises in less than 24 hours’ time. Detailing the wretched condition of the house, as well as Dr. Lonowski’s dim prognosis of the parents’ psychological state, OCS urges the evidence supports a finding of lack of parental compliance under La. Ch. C. art. 1036 C(6) and (7). It contends that doing their best and cooperating with OCS will not thwart this showing. State in Interest of DSC, 35,893 (La.App. 2 Cir. 2/27/02), 811 So.2d 198. OCS also argues it is not in the children’s best interest to be kept in foster care indefinitely when the parents demonstrate an inability to care for them. State in Interest of JM, 2002-2089 (La.1/28/03), 837 So.2d 1247. OCS concludes that the evidence was indeed clear and convincing.
| ¡¡Court-appointed counsel for the children has filed a brief adopting the OCS’s position and urging affirmance.

Discussion

Mr. and Ms. M do not contest that over a year had elapsed since the children were removed from their home pursuant to court order; this satisfies the first element of Art. 1015(5).
As for the second element, lack of substantial parental compliance, this court recognizes Mr. and Ms. M’s initial progress in attending the parenting and anger management classes. The evidence showed, however, that after the three older girls were returned in April 2002, case workers observed a swift and steady decline in the condition of the home, with poor clothing and hygiene, and a total absence of parenting support from Mr. M. Unacceptable conditions persisted despite an extraordinary level of support from OCS, VOA and home health nurses. In addition, Mrs. Morton found that Ms. M was “increasingly overwhelmed” by the burden of caring for four very small children. On this record, the district court was entitled to find by clear and convincing evidence that the conditions leading to removal of the children persisted and that Mr. and Ms. M made no substantial improvement in redressing the problems preventing reunification.
As for the final element, lack of any reasonable expectation of significant improvement, the state’s evidence was overwhelming. ' Dr. Lonowski initially thought both parents would benefit from counseling, but by July 2002, he found no improvement in their mental health status and felt that no improvement was in the offing. He also testified the children would hnbe in danger if returned to the home; the bruising discovered on LFM on the morning of May 31, 2002 convincingly *318 fulfilled the doctor’s fears. Later revelations of mistreatment included an obvious violation of LBW’s privacy and leaving LFM with a known child abuser. This court need not elaborate on Mr. and Ms. M’s odd and promiscuous lifestyle.
Further to corroborate Dr. Lonowski’s impression, Ms. M admitted she did not like OCS intervention and “people [need to] stay out of my business and not tell me how to raise my children and take care of my kids.” This statement is incomprehensible, considering the level of intervention expended to attempt reunification of the family.
Taken as a whole, the record clearly and convincingly shows that because of mental deficiency Mr. and Ms. M are incapable of exercising parental responsibilities without exposing the children to serious harm and that they are unable to provide an adequate permanent home. In short, the district court was not plainly wrong to find the state proved all three elements required to terminate parental rights. State in Interest of DSC, 35,893 (La.App. 2 Cir. 2/27/02), 811 So.2d 198.
Finally, termination of parental rights must be in the best interest of the children. La. Ch. C. art. 1037 B. According to the final family team conference report, dated March 11, 2003, all four children were placed with foster parents in Caddo Parish who were willing to keep the family group together. Mrs. Morton, the OCS case manager, and Mrs. Chilvers, the family counselor, both testified that termination was in the children’s best interest. As we noted in State, in Interest of DSC, supra, permanency and Instability for the children has at length preempted the parents’ rights. The district court was not plainly wrong to find that termination is in the children’s best interest.

Conclusion

For the reasons expressed, the judgment of termination is AFFIRMED at the appellants’ costs.
AFFIRMED.

. The judgment also terminated the parental rights of LOM’s father and LBW's putative father, but those parties have not appealed.

. State in Interest of JL was overruled on other grounds in State in Interest of ML, 95-0045 (La.9/5/95), 660 So.2d 830.